KENDRA J. JEPSEN, Esq.
Nevada State Bar No. 14065
JEPSEN LAW, PLLC
405 Marsh Street
Reno, Nevada 89509
Telephone: (775) 376-7070
Kendra@JepsenLawNV.com
SILVIA U. VILLANUEVA, ESQ.
Nevada State Bar No. 13608
BLACK & WADHAMS
50 W. Liberty Street, Ste. 1100
Reno, Nevada 89501
Mailing Address:
316 California Avenue, #255
Reno, Nevada 89509
*Attorneys for Ms. Amber Howell*

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| MS. AMBER HOWELL<br><br>Plaintiff,<br><br>vs.<br><br>WASHOE COUNTY, a political Subdivision of the State of Nevada, and DOES I-XX<br><br>Defendant. | Case No.: Case No.: 3:24-cv-00280-CSD<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |

## OBJECTIONS

Plaintiff, MS. AMBER HOWELL (hereinafter "**Plaintiff**" or "**Howell**"), by and through her attorneys of record, KENDRA JEPSEN, ESQ. of the law firm JEPSEN LAW, PLLC, and SILVIA U. VILLANUEVA, ESQ. of the law firm, BLACK & WADHAMS, **objects to the admissibility of Exhibit 9 based on Defendant's failure to disclose to Plaintiffs prior to the close of discovery. Accordingly, Plaintiff requests that this Court strike exhibit 9 from the record until such time that Plaintiff may file appropriate motions to preclude the admission of such evidence at trial.**

1

Further, Plaintiff files this Opposition to Defendant's Motion for Summary Judgment ("**Opposition**"). This Opposition is based upon the memorandum of points and authorities set forth below, the papers, pleadings, deposition testimony, admissible evidence, and records on file with the Court, of which judicial notice is respectfully requested, and any oral argument entertained by the Court.

## MEMORANDUM OF POINTS AND AUTHORITIES

The Motion for Summary Judgment ("**Motion**") filed by Defendant, Washoe County ("**County**" or "**Defendant**") is troublesome, as the County's "undisputed facts" rest almost entirely on testimony from itself and its own leadership team who have a personal interest in the County's success. Fundamentally, a fact is not "undisputed" if its sole support is the self-interested testimony of the party advancing that position. Such testimony, by definition, is simply an allegation subject to credibility determinations and dispute, which must be resolved by the trier of fact.

As this Court is aware, undisputed facts are established through evidence that is not easily contested such as admissions by the opposing party, documentary evidence, or testimony from neutral or adverse witnesses. The County's reliance on its own testimony does not meet the federal summary judgment standard, particularly because the County has not demonstrated any instance where the Plaintiff has conceded or adopted its testimony nor has it provided additional documentary evidence. Rather the County attempts to characterize its own version of events into established fact merely by labeling it "undisputed," without corroborating it with Plaintiff's testimony, stipulations, or objective evidence. That is simply insufficient when attempting to establish that there is no genuine issue of material fact. Accordingly, Plaintiff respectfully requests this Court disregard the County's so-called "undisputed facts" to the extent they rely exclusively on self-serving testimony and more accurately treat those assertions as genuine disputes of material fact.

## I.  INTRODUCTION

In or about July 2015, Washoe County's Board of County Commissioners appointed Plaintiff as the Director of Washoe County Human Services Agency ("**HSA**"). Plaintiff had a meaningful and fruitful career with Washoe County ("**Defendant**" or "**County**") that was tainted when eight years into Plaintiff's career Defendant began subjecting Plaintiff to adverse and intolerable employment conduct, which ultimately cut short Plaintiff's career with the County.

## II.  LEGAL ARGUMENT

Plaintiff's lawsuit primarily claims that the County violated Title I of the Americans with Disabilities Act ("**ADA**"), the Rehabilitation Act, and Nevada Law (NRS 613.330) when it failed to provide Plaintiff with reasonable accommodation, retaliated against Plaintiff for engaging in a protected activity, and took adverse action against Plaintiff, including constructively discharging Plaintiff, because of Plaintiff's disability.[1]

### a.  ADA Discrimination

The ADA forbids an employer with fifteen or more employees from discriminating against a qualified individual regarding job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment because of the qualified individual's disability. 42 U.S.C. § 12112. A qualified individual with a disability may show ADA discrimination by presenting evidence of disparate treatment, by showing an employer's failure to accommodate, or by showing evidence of adverse

---

[1] It is well established that there is no significant difference in analysis of the rights and obligations created by the Americans with Disabilities Act of 1990 (ADA) and the Rehabilitation Act. Mattioda v. Nelson, 98 F.4th 1164, 1173 (9th Cir. 2024). "District courts in the Ninth Circuit, and Nevada courts, use the federal ADA standard to evaluate disability discrimination claims brought under Nev. Rev. Stat. § 613.330." Dooley v. Nevada Gold Mines, LLC, 2023 WL 7279993, at *3 (D. Nev. Nov. 3, 2023).

discriminatory action by the employer because of the individual's disability. Dunlap v. Liberty Natural Prods., Inc., 878 F.3d 794, 798 (9th Cir. 2017); Flaherty v. Entergy Nuclear Operations, Inc., 946 F.3d 41, 53 (1st Cir. 2019). Only the latter two are applicable in this case.

To establish a *prima facie* case of discrimination under the ADA, the Rehabilitation Act, and Nevada law, Howell must prove by a preponderance of the evidence that: (1) Plaintiff has a disability, (2) Plaintiff is otherwise qualified for the position, and (3) she suffered adverse employment action because of her disability. Thompson v. Donahoe, 961 F. Supp. 2d 1017, 1031–32 (N.D. Cal. 2013) (citing to Walton v. U.S. Marshals Serv., 492 F.3d 998, 1005 (9th Cir. 2007) (superseded by statute on other grounds)). Furthermore, disability discrimination claims are analyzed under the same McDonnell Douglas burden shifting analysis as applied in Title VII claims. See McDonnell Douglas Corp. v. Green, 411 U.S. 792. (1973); Mustafa v. Clark Cnty. Sch. Dist., 157 F.3d 1169, 1175–76 (9th Cir. 1998); Sisson v. Helms, 751 F.2d 991, 992–93 (9th Cir. 1985). Under the McDonnell Douglas framework, a Plaintiff has the initial burden of establishing a *prima facie* case of ADA discrimination. Flaherty v. Entergy Nuclear Operations, Inc., 946 F.3d 41, 53 (1st Cir. 2019) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)). However, "[u]nder the McDonnell Douglas framework, the requisite degree of proof necessary to establish a *prima facie* case on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence." Koch v. Unum Grp., No. 24-6634, 2025 LX 460736, at *2 (9th Cir. Nov. 7, 2025); See also Kama v. Mayorkas, 107 F.4th 1054, 1059 (9th Cir. 2024) (finding that "the plaintiff's evidentiary burden is low"). If a plaintiff adequately establishes a *prima facie* case, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse action. Kama v. Mayorkas, 107 F.4th 1054, 1059 (9th Cir. 2024). If the employer provides a reason for taking such action, then the burden shifts back to the plaintiff to show that the asserted reason is merely a pretext for retaliation. Id. A plaintiff can establish pretext "(1) directly, by showing

that unlawful discrimination more likely [than not] motivated the employer; [or] (2) indirectly, by showing that the employer's proffered explanation is unworthy of credence because it is internally inconsistent or otherwise not believable; or via a combination of the[se] two kinds of evidence." Id.

### i. The Plaintiff Has a Disability that Substantially Limited One or More Major Life Activity

The ADA defines "disability" as: (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual, (B) a record of such an impairment, or (C) being regarded as having such an impairment. 42 U.S.C. § 12102(2). Included within the definition of "physical or mental impairment" is (1) any physiological disorder or condition, and (2) any mental or psychological disorder, such as an emotional or mental illness. 29 C.F.R. § 1630.2.

#### (i)    Plaintiff's Diagnosed Mental Impairment is a Disability

On April 30, 2023, Howell's Psychiatrist, Dr. Yingchia Cheng, at Reno Behavioral Healthcare Hospital, diagnosed Howell with Major Depressive Disorder, recurrent (F33.9) constituting symptoms of (1) depression, (2) alcohol abuse, and (3) maladaptive coping skills.[2] In this case, Plaintiff has a documented history of medical providers who have diagnosed Plaintiff with Major Depressive Disorder, severe without psychosis (F33.2), Post Traumatic Stress Disorder (F43.1), and Anxiety disorder, unspecified (F41.9).[3] However, even before that, the County's own counselor, Janice Fung, MA, LADC, reported that Howell was "experiencing professional and personal stress" and recommended that Howell receive counseling services.[4] In all instances, Howell's medical providers advised her to receive treatment for her mental impairments: Major Depressive Disorder, Post Traumatic Stress Disorder, and Anxiety disorder.

---

[2] Exhibit 1 at Bates Howell_00255.
[3] Exhibit 2 Bates Howell_00268 - Howell_00269; Exhibit 3 at Bates Howell_01035; Exhibit 4 at Bates Howell_00271-Howell_00279.

[4] Exhibit 5 at p. 3; Exhibit 6 at p. 21:2-15.

To date, the Defendant has not taken the testimony of any witness or medical professional that has provided testimony contravening Plaintiff's mental illness diagnoses as evidenced by Plaintiff's medical records. In fact, the deadline for providing expert disclosures was August 6, 2025, and Defendant elected not to provide an expert report from a medical professional, is now precluded from doing so at trial. Consequently, upon a review of the evidence in the light most favorable to the nonmoving party, this Court must issue a finding that Plaintiff suffered from a mental impairment because (1) there is a genuine dispute as to that fact, and based upon the material evidence (2) a trier of fact could return a verdict for the Plaintiff. Under Rule 56(c), summary judgment is improper if the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations admissions, interrogatory answers, or other materials, if any, demonstrates a genuine dispute of material fact. Celotex Corp., 477 U.S. at 322.

### (ii) Plaintiff's Mental Impairment Substantially Limited One or More Major Life Activity

The EEOC's regulations define "major life activities" to include performing manual tasks, sleeping, speaking, concentrating, thinking, communicating, interacting with others, and working. 29 C.F.R. § 1630.2 (i).  When considering whether a plaintiff's mental impairment "substantially limits" one or more major life activities, the Court need only look to the regulations which provide rules of construction and clarify that the term "substantially limits" should be construed broadly "in favor of expansive coverage". 29 C.F.R. § 1630.2(j). Specifically, the regulations provide the following in relevant part:

(i)  […]

(ii) An impairment is a disability within the meaning of this section if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population. An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting. Nonetheless, not every impairment will constitute a disability within the meaning of this section.

> (iii) **The primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether an individual's impairment substantially limits a major life activity. Accordingly, the threshold issue of whether an impairment "substantially limits" a major life activity should not demand extensive analysis.**

> (iv) The determination of whether an impairment substantially limits a major life activity requires an individualized assessment. However, in making this assessment, the term "substantially limits" shall be interpreted and applied to require a degree of functional limitation that is lower than the standard for "substantially limits" applied prior to the ADAAA.

> (v) **The comparison of an individual's performance of a major life activity to the performance of the same major life activity by most people in the general population usually will not require scientific, medical, or statistical analysis.** Nothing in this paragraph is intended, however, to prohibit the presentation of scientific, medical, or statistical evidence to make such a comparison where appropriate.

> (vi) The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures. However, the ameliorative effects of ordinary eyeglasses or contact lenses shall be considered in determining whether an impairment substantially limits a major life activity.

> (vii) **An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active**.

> (viii) An impairment that substantially limits one major life activity **need not substantially limit other major life activities in order to be considered a substantially limiting impairment.**

> (ix) […]

29 C.F.R. § 1630.2(j) [Emphasis added].

Testimony from both the County and Plaintiff's direct reports objectively reveal that Plaintiff experienced difficulty focusing; slowed cognition; difficulty communicating, including the ability to follow conversations and maintain a consistent train of thought; and impaired decision-making.[5] Ryan, Steve, and Pamela all reported that they observed slurred speech and erratic decision-making

---

[5] Exhibit 7 at p. 13:8-11, at p. 16:18-22, at p. 49:13-15, at p. 49:18-25, at p. 50:1-14; Exhibit 8 at p. 13:9-11, at p. 13:17-24; at p. 44:3 - 45:1; Exhibit 9 at p. 8:6-15, at p. 44:7-23, at p. 47:2-21, at p. 48:12-20, at p. 49:1-5.

from Plaintiff beginning in or around 2022 and into April 2023.[6] Evidence of Plaintiff's disability substantially limited major life activities is further bolstered by medical records provided by Plaintiff's medical providers. Plaintiff's medical records from Silver State Counseling and Therapy report Howell as "struggling to fall asleep" and Howell getting about "an hour of sleep."[7] Plaintiff's therapist, Mark Brehm, LCSW, MSW, also noted Plaintiff was experiencing sleep disruption and described Plaintiff's thought process as "irrational" and being "blocked."[8] Similarly, Janice Fung and Dr. Frank Lemus reported Howell as suffering from a "lack of sleep."[9] As the regulations make clear, determining whether Plaintiff's disability substantially limited activities of daily living for the Plaintiff should not demand an extensive review and does not require scientific, medical, or statistical analysis. This Court must remain mindful that "[t]he primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, *not* whether an individual's impairment substantially limits a major life activity." 29 C.F.R. § 1630.2(j)(1)(iii) [Emphasis added].

> ### (iii)     *Plaintiff is a Qualified Individual Capable of Performing the Essential Functions of HSA Director*

In its Opposition to Howell's Motion for Summary Judgment (ECF No. 117), the County concedes that Howell was a qualified individual capable of performing the essential functions of HSA director.  *See* ECF No. 117, p.2:27, p. 3:1-2.  As such, this is an undisputed fact at this time.

> ### (iv)     *A reasonable juror could find that the County's reasoning for its adverse action against Plaintiff is pretext for discrimination.*

As previously discussed, the first step under the McDonnell Douglas framework is establishing *prima facie* evidence of ADA discrimination. McDonnell Douglas Corp., 411 U.S. 792.

---

[6] Id.
[7] Exhibit 3 at Bates Howell_01031.
[8] Id. at Bates Howell_01034 - Howell_01039
[9] Exhibit 4 at Bates Howell_0027; Exhibit 5 at p. 3; Exhibit 6 at p. 21:2-15.

8

(1973). Accordingly, Howell must show that the County's adverse actions would not have occurred "but for" her disability. Feist v. Louisiana, 730 F.3d 450, 454 (5th Cir. 2013). Notably, Plaintiff need not establish her *prima facie* case by a preponderance of the evidence, as stated by the Defendant.[10] Under this first step, Plaintiff's requisite degree of proof for purposes of summary judgment is minimal **and does not even rise to the level of a preponderance of the evidence**. Kama, 107 F.4th at 1059 (9th Cir. 2024). In this case, Plaintiff's evidence of causation is overwhelming and exceeds well beyond the minimum threshold required.

*Firstly*, Plaintiff's mental health impairments, as outlined above, outwardly manifested as behavioral irregularities or oddities. The Defendant concedes that it was "solely" Plaintiff's "erratic behavior" that led to its decision to place Plaintiff on paid administrative leave and required Plaintiff undergo a substance abuse evaluation. (ECF No. 105 at 19:3-7). It is widely understood that "conduct resulting from a disability is considered part of the disability, rather than a separate basis for termination." Humphrey v. Mem'l Hosps. Ass'n, 239 F.3d 1128, 1139-40 (9th Cir. 2001); Gambini v. Total Renal Care, Inc., 486 F.3d 1087, 1093 (9th Cir. 2007). The Ninth Circuit found there to be few exceptions to this general rule, which it made quite clear more than two decades ago when it stated the following:

> The link between the disability and termination is particularly strong where it is the employer's failure to reasonably accommodate a known disability that leads to discharge for performance inadequacies resulting from that disability. Id.

The County improperly cites to Wood v. Univ. Physicians Healthcare, 657 F. App'x 643, 645 (9th Cir. 2016) and Raad v. Fairbanks N. Star Borough Sch. Dist., 323 F.3d 1185, 1197 (9th Cir. 2003) in support of its position that Plaintiff is precluded from relying on her condition as the basis for her disability claim. Specifically, the County asserts that Howell is precluded from relying on her

---

[10] Defendant's Motion (ECF No. 105 at p. 15:2-3).

condition because she was not diagnosed with PTSD until after she was placed on leave, but the County misstates both the facts and the law. First, Plaintiff was diagnosed with depression and visiting with a therapist prior to being placed on paid leave. [11] Second, the County's use of Wood for legal support is flawed because the holding in Wood is based upon a claim for retaliation for engaging in a protected activity. Id. The Plaintiff in Wood alleged her employer retaliated against her for calling a hotline, but the Court determined the employer's actions took place prior to the employee's hotline call and therefore could not have been retaliatory. Id. The facts in Wood are inapplicable here.

The County further contends that it could not have discriminated against Plaintiff because Plaintiff "did not inform anyone at the County that she had PTSD or that she was receiving treatment for the condition." (ECF No. 105 at p. 19:23-24). However, the Defendant fails to acknowledge that the ADA does not require Plaintiff to "inform" anyone of her disability and such a requirement would belie the point of the ADA. The County could have learned of Plaintiff's condition in a number of ways.

*Secondly*, even if we assume *arguendo* that it was appropriate for the Defendant to require Plaintiff to undergo a drug test due to reports of suspected substance use, there is still a genuine dispute regarding whether the County's asserted reasons for (1) terminating all Plaintiff's access to Plaintiff's work cell phone, (2) investigating Howell for misconduct, (3) placing Howell on unpaid leave, and (4) recommending her termination are pretext. For instance, causation can be inferred from timing alone. Koch v. Unum Grp., No. 24-6634, 2025 LX 460736, at *3 (9th Cir. Nov. 7, 2025) (holding that an employee's termination—less than a month after his harassment complaint—was sufficient to raise a strong causal inference of retaliation); See also Reynaga v. Roseburg Forest

---

[11] Exhibit 10 at p. 37-38.

Prods., 847 F.3d 678, 694 (9th Cir. 2017) (holding that proof of a causal link between employee's complaint and his termination—as evidenced by temporal proximity—is relevant to an evaluation of pretext); Stegall v. Citadel Broad. Co., 350 F.3d 1061, 1069-70 (9th Cir. 2004).

In Koch, the Ninth Circuit determined that the close temporal proximity between the date employee plaintiff filed his harassment complaint and the date plaintiff was terminated sufficiently raised a strong causal inference of retaliation. Id. at *3. Similarly, here, the County informed Plaintiff that she was under investigation for alleged misconduct only (2) days after Janice Fung, the substance abuse counselor that the County hired to evaluate Howell, determined that Howell did not meet the criteria for a substance use disorder but instead was "experiencing professional and personal stress."[12] Further, the County did not retain its "independent" investigator, Sandra Ketner, until April 24, 2023 – approximately a week after Howell's negative drug test and initial evaluation with its counselor, Janice Fung.[13] Additionally, Janice Fung's written evaluation is dated May 30, 2023.[14] In this case, a reasonable trier of fact would likely have concerns regarding the credibility of the County's testimony.

***Thirdly***, the Defendant has demonstrated no documented history of Plaintiff's alleged misconduct except what the County's investigator solicited from County employees ***after*** Plaintiff's evaluation with the County's therapist.[15] Howell served in the role of HSA Director for nearly a decade without ever receiving a single write-up or any other form of progressive discipline.[16] In fact, during Plaintiff's last performance review for the period of July 13, 2019 to October 29, 2020, Defendant testified to describing Plaintiff's performance as either exceeding requirements or meeting

---

[12] Exhibit 5 at p. 3; Exhibit 6 at p. 21:2-15.
[13] Exhibit 11.
[14] Exhibit 5
[15] Exhibit 12; Exhibit 6; and Exhibit 5 from Patricia Hurley's Deposition.
[16] Exhibit 13.

requirements.[17] This reality is further corroborated by the fact that Howell received merit pay annually every year that she was employed by the County. The County admitted that merit pay is based upon an employee's performance evaluation and that not every employee is entitled to merit pay.[18]

*Fourth*, the County's delay in discussing its performance concerns with Howell, followed by the County's post hoc explanations for why it waited so long are suspicious enough to create a genuine dispute regarding the real reason the County took adverse action against Howell. In Peirick v. Ind. Univ.-Purdue Univ. Indianapolis Ath. Dep't, 510 F.3d 681, 693 (7th Cir. 2007), the employer defendant sought summary judgment against plaintiff employee, Peirick, on the contention that Peirick had insufficient evidence to overcome her burden of proving employer defendant's reason for terminating Peirick was pretext. Id. Specifically, defendant employer alleged it terminated Peirick because her performance fell below its legitimate expectations. Id. at 691-92. Defendant employer claimed Peirick used abusive language when talking with students, abandoned a van filled with students, was an unsafe driver, and told students that the administration was to blame for the unavailability of the Tennis Center during the conference tournament. Id. However, although Peirick had undisputed conduct violations, employer defendant also conceded that Peirick outshined her colleagues with respect to the majority of documented expectations; her players consistently earned the highest or second highest GPA; she was nationally recognized for her community service; and under her leadership, the women's tennis team earned its best record in school history and became the first women's team at defendant's school to advance to the NCAA post-season tournament. Id. Additionally, the record did not reflect any evidence of budgeting or fundraising deficits. Id. Notwithstanding, defendant employer argued that none of Peirick's documented success mattered

---

[17] Exhibit 14 at p. 40:20-23.
[18] Exhibit 15 at p. 71:9:19.

12

because Peirick fell terribly short on a single measure--professional conduct--and that merited termination. Id. at 692. The Court ultimately denied defendant employer's motion for summary judgment because it determined that a reasonable jury might not believe defendant employer. Id. Specifically, the Court expressed concern because defendant employer never warned Peirick that her alleged negative conduct could lead to dismissal. Id. The Peirick Court determined that defendant employer's delay in addressing its alleged concerns undermined its claim that Peirick's behavior was unsafe or severe. Id. at 692-93.

Here, similar to Peirick, Howell had a documented record of success with no history of discipline. As previously discussed, Howell's performance evaluations report Howell as either meeting expectations or exceeding expectations.[19] The County conceded that it never received reports of Howell failing to adhere to her responsibilities.[20] However, just like in Peirick, the County contends that none of Howell's accomplishments and documented success matters because "an independent investigator found that [Howell] engaged in serious misconduct" and that's why she was terminated.[21] Similar to Peirick, a reasonable jury might not believe the County because the County did not inform Howell of its concerns regarding her conduct until after the County forced Howell to undergo an evaluation with Janice Fung.[22] This possibility is augmented when considering that while the County's substance abuse counselor was having regular meetings with Howell, the County's investigator was soliciting complaints against Howell from its employees.[23] Eventually the County lambasted Plaintiff with three years' worth of complaints two months after the County knew or had reason to know of Plaintiff's disability.[24] The County has provided examples of communications

---

[19] Exhibit 14
[20] Exhibit 16.
[21] ECF No. 105 at p. 20:19-21.
[22] Exhibit 11 investigative report Amber received on June 14, 2023.
[23] Exhibit 17 Bates WC040-WC0414.
[24] Exhibit 11 Investigation report provided to Amber along with letter re her termination.

13

among its employees that it contends are evidence of Plaintiff's misconduct, including some of those listed below, which Plaintiff has provided corresponding justifications for each:

> *Howell's unusual/erratic behavior and possible substance abuse during meetings. Ex. 8, p. 55; Ex. 17, p. 39. Howell's appearance of being under the influence of drugs or alcohol were based on observations that she was unable to speak clearly, had slurred her speech, cried, went off topic, and was unable to focus. Ex. 8, p. 56; Ex. 16, pp. 42-44; Ex. 17, pp. 39, 46-47; Ex. 18, pp. 49- 50.*

Plaintiff concedes that symptoms from her disability substantially limited Plaintiff's ability to engage in activities of daily living, including Plaintiff's communication and ability to focus, speak, think, sleep, and concentrate. Reports of erratic behavior and possible substance abuse, which County employees testified to observing somewhere between November 2022 to April 2023,[25] was merely conduct resulting from Plaintiff's disability and therefore a non-terminable offense. Humphrey, 239 F.3d at 1139-40.

> *Howell's request for prescription medications, including opiates and Xanax to HSA staff. Ex. 4, p. 143; Ex. 17, pp. 64-66.*

At the time of the alleged allegation, Plaintiff had a long, documented history of Endometriosis and Sacroiliitis nerve pain.[26] Plaintiff's medical records from Reno Tahoe Pain Associates show Plaintiff reported regularly experiencing "numbness, tingling, burning, sharp, throbbing, cramping."[27] Plaintiff's Endometriosis and associated lumber pain was so severe she underwent a hysterectomy in January 2024.[28] Notably, Plaintiff had been under the care of a pain management doctor for her lower back pain since January 2020.[29] Dr. Kenneth P. Pitman at Nevada Pain and Spine first prescribed Plaintiff 350MG of Soma and 600MG of Ibuprofen and directed that Howell take

---

[25] Exhibit 7 at p. 13:8-11; at p. 49:13-15, 18-25; at p. 50:1-14; Exhibit 18 at p. 16:18-22; Exhibit 8 at p. 13:9-11, 17-24; at p. 44:3 - 45:1; Exhibit 9 at p. 8:6-15; at p. 44:7-23; at p. 47:2-4, 7-21; at p. 48:12-20; at p. 49:1-5.
[26] Exhibit 19.
[27] Id. at Howell_01214.
[28] Exhibit 20 at p. Howell_00975.
[29] Exhibit 21.

them up to three times daily, as needed.[30] It's likely that a reasonable jury could conclude that reports of alleged opiate abuse were misguided.

> *Howell's removal of a large volume of clothing from HSA's Family Engagement Center for children for whom Howell was personally providing respite care. Ex. 8, pp. 55, 102-03.*

Ryan Gustafson, the County's current HSA Director, testified during his deposition that it is not a violation of County policy to provide children of families in need with supplies like clothing, regardless of whether it is being provided to someone associated with a County employee.[31]

**Ryan Gustafson:** Amber: I have a friend who's going to raise her grand baby. Can we get a stroller, car seat pack - - pack and play, and diapers/wipes. Not to buy. Just in stock somewhere. And maybe some clothes at Kids Kottage.
Me: Let me see what we have. Hang on. I'm here. Newborn? How old?
Amber: Not born yet. Any day.
Me: Okay.
Amber: How about Baby's Bounty?
Me: Yeah. They do have great little newborn bundles.

**Attorney Jepsen:** Is it -- do you know if this was – this request was for a family under HSA?

**Ryan Gustafson:** I don't know. I assume that it was. But what I can say about this request is that it doesn't really matter if it was for an HSA family or not. **We try to be as preventative as we can. And so if a -- us giving a stroller and a pack and play and diapers to a family in need is not atypical.**

> *Howell's failure to comply with fiscal requirements by frequently requesting gift cards, claiming it was for families, and then failing to complete the necessary documentation to justify obtaining the cards. Id. at 56-57.*

Pamela Mann, the County's Director of Finance and Administration, confirmed that "formal forms" concerning the fiscal process for requesting gift cards for families in need was not developed

---

[30] Id.
[31] Exhibit 22 at p. 65-67.

until approximately February 13, 2023.[32] Accordingly, it's quite possible a jury could determine that two months is too short a time frame to expect employees to fully understand a new internal policy and be capable of flawless compliance.

> *Howell's expectation that staff buy her expensive gifts for holidays and in exchange for approving their vacation leave requests, leave payouts, and other management decisions. Id. at 72-77.*

The facts suggest it was customary for employees within HSA, including the division directors, to exchange gifts during the holidays.[33] For example, Cara Paoli stated that she participated in gift exchanges with other HAS employees.[34] She equally gave and received gifts, "[s]ometimes cookies if someone made cookies. Or I think a bottle of wine from a couple of the division directors."[35] Cara Paoli also acknowledged receiving gifts from Howell. Similarly, Pamela Mann recalled at least three or four years when she also participated in gift exchanges with County employees.[36] She stated "[m]ost of my peers drink wine, and so just sort of a culture of giving a gift to a peer and sometimes it was wine, sometimes it was tins of cookies, sometimes it was -- one year I did a series of like holiday shaped gift boards and a bottle of wine and a gift certificate to get certain cheeses at places, so just each year did something for the team of my direct peers."[37]

> *Howell's favoritism toward certain employees and HSA clients. Ex. 4, p. 143; Ex. 17, pp. 62-63.*

The County's above-mentioned allegation references complaints the County allegedly received regarding Howell giving a plant to an HSA employee that was diagnosed with cancer.[38]

---

[32] Exhibit 23, at p. 70-73:3-6.
[33] Exhibit 24 at p. 56.
[34] Id.
[35] Id.
[36] Exhibit 25 at p. 131 – 134.
[37] Exhibit 25 at p. 132:1-7.
[38] Exhibit 26 at p. 62-63.

In this case, a jury could conclude that it was not unreasonable or a violation of the County's core competencies to visit a sick colleague at her house and bring her what can arguably be described as a get-well plant.

> *Howell's erratic decisions such as transferring Paoli and McBride to different divisions. Ex. 17, pp. 47-48.*

The County, through its 30(b)(6) witness, Kate Thomas, conceded that Howell, as the HSA Director, had discretion to shift its division directors around and in fact Kate Thomas initially supported Howell in that decision.[39] Kate Thomas also conceded that the aforementioned allegation against Howell was very much a he said, she said situation.[40]

> *Howell's misuse of County property such as using Reno Aces baseball tickets for herself when they were intended to be used by foster parents. Id. at 66-67; Ex. 4, p. 98-99, 143.*

Defendant's assertion about how Reno Aces' baseball tickets must be used is conjecture. Although the County received Aces tickets because it was a sponsor, the County had no policy that either precluded County employees from using the Aces baseball tickets nor a policy that required such tickets be used only for foster parents. While Cara Paoli may have personal beliefs regarding the use of such tickets, that is insufficient to establish Plaintiff's actions, if true, were a violation of the County's core competencies.

### b.  Constructive Discharge

The County discriminated against Howell because of her disability when it compelled a resignation from Howell. If shown, constructive discharge is an adverse employment action. Green v. Brennan, 578 U.S. 547, 555, 136 S. Ct. 1769, 1776-77 (2016). A constructive discharge occurs when the working conditions are so intolerable that a reasonable person in the plaintiff's position

---

[39] Exhibit 27 at p. 60-61.
[40] Exhibit 28 at p. 62:11-16.

17

would feel compelled to resign. <u>Pa. State Police v. Suders</u>, 542 U.S. 129, 141, 124 S. Ct. 2342, 2351 (2004). A claim of constructive discharge consists of two elements: (1) discrimination by the employer to the point where a reasonable person would have felt compelled to resign, and (2) actual resignation. <u>Green</u>,136 S. Ct. 1769, 1777 (2016). The County references page 95-96 of Howell's deposition and states, "[a]dditionally, Howell made it clear that it was her own choice to resign and that she was not forced to do so."[41] However, the County's representation of the facts is incorrect. Specifically, Plaintiff was never asked, "did you leave the County by choice."[42] Rather, the question Plaintiff was asked was whether she drafted certain text messages, to which Howell responded, "yes."[43]

This significant distinction is important because Howell never admitted to resigning by choice. The only thing Howell admitted to was sending the text messages. What the County did not address in their Motion was that the County's pattern of abuse towards Howell led Howell to suspect termination was forthcoming.[44] Accordingly, Howell proactively began efforts to seek new employment in the hopes of mitigating the damage from losing her income.

| | |
|---|---|
| **Attorney Jepsen:** | And then in Exhibit 12, your text messages between you and Richard Whitley, you stated: I am leaving by choice. Do you feel as though you actually left the County by choice? |
| **Amber Howell:** | No. I said that to him because I was trying to seek alternative employment, and I didn't think that it would be a good idea to say I'm leaving because they are going to terminate me. I still needed to make a living.[45] |

To add salt to injury, the County also misrepresents the timeline of events regarding Howell's date of resignation. The County contends, "Howell's decision to resign was made before Ketner

---

[41] ECF 105 at p. 22:3-4.
[42] Exhibit 29 at p. 95.
[43] Exhibit 29.
[44] Exhibit 30 at p. 137-138.
[45] Exhibit 30.

issued her final investigative" "and before Manager Brown made the recommendation to terminate her."[46] That is false. The investigation from Sandra Ketner was issued on June 20, 2023 and the County's Notice of Proposed Action informing Howell of Eric Brown's recommendation for termination is dated July 13, 2023.[47] Howell's email to the County informing Eric Brown of her resignation is dated July 18, 2023.[48]

Although Howell had the procedural opportunity to challenge Manager Brown's recommendation for termination, it was the totality of the circumstances: unpaid leave, public allegations, reputational harm, and the impending public hearing concerning her disability, that created intolerable conditions. The undisputed facts show that a reasonable jury could likely conclude that she was, in fact, constructively discharged.

### c.    Failure to Accommodate

The County claims that Howell's claim for failure to accommodate fails because the County had no notice because she never requested an accommodation and that the County satisfied its obligations because she was later granted FMLA. Both of these arguments collapse under the record and governing Ninth Circuit Law. The County admits that an employer has an obligation under the ADA to engage in the interactive process and identify and implement reasonable accommodation once an employer becomes aware of the employee's need for an accommodation. See ECF No. 105, 24:8-10; see also Humphrey v. Mem'l Hosps. Ass'n, 239 F.3d 1128, 1137. In fact, "[o]nce an employer becomes aware of the need for an accommodation, that employer **has a mandatory obligation under the ADA** to engage in an interactive process with the employee to identify and implement appropriate reasonable accommodations." Id. If an employer fails to engage in the

---

[46] CF 105 at p. 22:5-8.
[47] Exhibit 11; Exhibit 31.
[48] Exhibit 32, July 18, 2023, email to the County, Bates WC1255-WC1256 and WC2825.

interactive process, liability is appropriate if an employer fails to provide a reasonable accommodation that would have been possible without undue hardship to the employer. Id. at 1138.

Here, the County's own recitation of the facts demonstrate that the County had notice of Howell's disability. Indeed, the County admits that "Howell was required to participate in the substance abuse evaluation so the County could determine if Howell had a problem that required treatment, or whether she was fit to return to work." See ECF No. 105, 25:23-25; see also, Ex. 4 of ECF No. 105, p. 25. The record reflects Howell suffered from diagnosed mental health conditions including Major Depressive Disorder and PTSD. Despite this, the County not only failed, but refused to engage in the interactive process to explore methods of accommodation before moving forward with adverse employment action against Howell. Further, the County puts the burden on Howell to request an accommodation. However, upon notice that Howell may be a qualified individual under the ADA, the County had an *affirmative duty* to engage in the interactive process. Humphrey, 239 F.3d at 1137 (emphasis added). Further, unpaid medical leave may be a reasonable accommodation. "Even an extended medical leave, or an extension of an existing leave period, may be a reasonable accommodation if it does not pose an undue hardship on the employer." Dark v. Curry County, 451 F.3d 1078, 1090 (9th Cir. 2006); see also Humphrey, 239 F.3d at 1135 ("A leave of absence for medical treatment may be a reasonable accommodation under the ADA.").

The County's argument that it began to engage in adverse employment action prior to Howell's requesting an accommodation likewise fails. In Humphrey, the employer made a similar argument stating that the employee was "not entitled to a leave of absence because she failed to ask for one before she was fired." Id. at 1139. However, the County "was under a continuing duty to offer a reasonable accommodation." Id. The County admits that Howell applied for, and was granted FMLA prior to being constructively discharged by the County. Had the County engaged in the interactive process and provided temporary leave, Howell could have returned to performing the

essential functions of HSA Director, as evidenced by her subsequent employment with the State of Nevada performing substantially similar duties.

Additionally, the County's argument that Howell did not "need" an accommodation because she could perform her job duties is inconsistent. The County makes this argument, while at the same time admitting the following: 1) the County received complaints Howell appeared impaired; 2) the County required Howell undergo a substance abuse evaluation; 3) the County initiated a misconduct investigation; and 4) the County recommended Howell's termination. If the County believed Howell's functioning was impaired, then accommodation—not termination—was the first step the County should have engaged in. If the County believed that Howell was fully capable of performing the essential functions of her position, then its justification for escalation of disciplinary procedures collapses. At a minimum, whether the County failed to reasonably accommodate Howell's disability presents a triable issue of fact, inappropriate for summary judgment.

### d. Unlawful Medical Examination

The County asks this Court to resolve, as a matter of law, that the County's mandatory "substance abuse evaluation" and related screening did not constitute a "medical examination" under the ADA. However, this is inappropriate as the analysis is fact-intensive and when the record is reviewed in Howell's favor, any reasonable jury could find that the County compelled a *de facto* medical examination prohibited by 42 U.S.C.§ 12112(d)(4)(A). See Indergard v. Georgia-Pacific Corp., 582 F.3d 1049, 1052-56 (9th Cir. 2009); see also Kroll v. White Lake Ambulance Auth., 691 F.3d 809, 815-20 (6th Cir. 2012).

The County ignores the undisputed facts in this matter and strategically attempts to relabel what occurred as a narrow, non-medical "fitness for duty" inquiry, while simultaneously admitting the evaluation's purpose was to determine whether Howell had an alcohol or substance abuse "problem" requiring "treatment" and whether or not she was "fit for duty." This is precisely the type

21

of employer directed, DSM-driven diagnostic inquiry § 12112(d)(4) regulates.  The County cannot obtain summary judgment on this issue by simply substituting labels for the prohibited medical examination it forced Howell to undergo.

### i.        The ADA's Medical-Exam Prohibition is Broadly Construed

Section  12112(d)(4)(A)  prohibits  employers  from  requiring  medical  examinations  or disability inquiries unless the examination is job-related and consistent with business necessity.  This provision applies regardless of whether the employee is disabled.  See Indergard, 582 F.3d at 1052; see also Kroll, 691 F.3d at 815.  "This section applies to all employees, whether or not they are disabled under the ADA."  Indergard, 582 F.3d at 1052-1053.  The "EEOC Enforcement Guidance draws a further distinction between medical examinations and physical agility tests."  Id. at 1053.  A "medical examination" is defined by the EEOC as a "procedure or test that seeks information about an individual's physical or mental impairments or health."  Id.  The EEOC's Enforcement Guidance "provides  a  seven-factor  test  for  analyzing  whether  a  test  or  procedure  qualifies  as  a  medical examination."  Indergard, 582 F.3d at 1053.  The seven-factor test is as follows:

(1) whether the test is administered by a health care professional;

(2) whether the test is interpreted by a health care professional;

(3) whether the test is designed to reveal an impairment or physical *or mental health*;

(4) whether the test is invasive;

(5) whether the test measures an employee's performance of a task or measures his/her physiological responses to performing the task;

(6) whether the test normally is given in a medical setting; and,

(7) whether medical equipment is used.

Indergard, 582 F.3d at 1053-1054.  Importantly, only "one factor may be enough to determine that a test or procedure is medical."  Indergard, 582 F.3d at 1053.  "The guidance further explains that

'psychological tests that are designed to identify a mental disorder or impairment' *are* 'medical examinations,' . . . ." Kroll, 691 F.3d at 816.

"Psychological examinations are medical if they provide evidence that would lead to identifying a mental disorder or impairment, listed in the American Psychiatric Association's most recent diagnostic and Statistical Manual of Mental Disorders (DSM)." *Id.* at 817. The Seventh Circuit held that an evaluation administered to employees seeking a portion that included the Minnesota Multiphasic Personality Inventory (MMPI) constituted a "medical examination" under the ADA because the MMPI "is designed, at least in part, to reveal mental illness and has the effect of hurting the employment prospects of one with a mental disability." Karraker v. Rent-A-Center, Inc., 411 F.3d 831, 837 (7th Cir. 2005). The Seventh Circuit determined that even though the employer was allegedly only using the test as a vocational scoring protocol and the test was not being scored by a psychologist, "the fact that a high score on the test could be 'one of several symptoms which may contribute to a diagnosis of paranoid personality disorder' was enough to conclude that the test was 'best categorized as a medical examination' subject to the ADA's restrictions." Kroll, 691 F.3d at 809 quoting Karraker, 411 F.3d at 837.

### ii.    The Substance Abuse Evaluation was Clearly a Medical Examination under the ADA

According to the County's own facts, it hired Janice Fung ("Fung"), a licensed Alcohol and Substance Abuse Counselor to evaluate whether Howell was suffering from a "substance abuse problem." Indeed, the County admits that "Howell was required to participate in the substance abuse evaluation so the County *could determine if Howell had a problem that required treatment*, or whether she was fit to return to work." See ECF No. 105, 25:23-25; see also, Ex. 4 of ECF No. 105,

23

p. 25.  This was not a simple workplace "inquiry"; it was a clinical assessment that involved four meetings over that resulted in a written evaluation.[49]

Here, it is undisputed that Plaintiff was instructed by WCHSA to undergo what they initially identified as a substance abuse evaluation.  As in Kroll, both factors one and two of the EEOC's seven-factor test are clearly satisfied.  Fung is a licensed substance abuse counselor, licensed in the clinical practice of counseling.[50]  Fung testified that she was not hired to perform a "fitness for work" examination, but a substance abuse evaluation.[51]  Further, during the evaluation, Fung made inquiries as to the nature and/or severity of Plaintiff's mental health and/or any diagnoses Plaintiff had previously received, and then reported the same back to Defendant.[52]  Fung testified that a substance abuse disorder is classified as a mental health disorder pursuant to the DSM-5.[53]  Fung also testified that she based her diagnosis, or in this case, the lack thereof, off the DSM-6 criteria for a substance use disorder.[54]

Like the Court in Kroll, this Court need not address the remaining factors to determine that the substance evaluation was, indeed, a medical examination.  However, the substance evaluation also meets the fourth factor in the EEOC's seven-factor test, whether the evaluation was invasive.  Here, while not physically invasive, the evaluation was mentally and personally invasive.  Fung testified that Plaintiff shared very personal information, including history of abuse, trauma, her medical and mental health history, etc. [55]  As such, the substance abuse evaluation meets four out of the seven factors in determining that the evaluation was a medical examination prohibited by 42 U.S.C. § 12112(d)(4)(A).

///

///

[49] Exhibit 5.
[50] Exhibit 6 at p. 9:25; at p. 10:1-5, 19-23.
[51] Exhibit 6 at p. 34:10-14, p. 44:14-21.
[52] Exhibit 6 at p. 29:2-24; 46:17-24.

[53] Exhibit 6 at p. 43:1-6.
[54] Exhibit 6 at p. 47:6-7.
[55] Exhibit 6 at p. 47:17-24.

### iii. The Substance Abuse Evaluation Was Not Consistent with Business Necessity

"A covered entity may conduct voluntary medical examinations, including medical histories, which are part of an employee health program available to employees at that work site. A covered entity may make inquiries into the ability of an employee to perform job-related functions." The burden is placed on the entity to make the requisite showing that the examination is job-related and consistent with business necessity. See Fredenburg v. Contra Costa County Dept. of Health Services, 172 F.3d 1176, 1182 (9th Cir. 1999) ("The only reasonable reading of this language places the burden on the covered entity . . . to make the requisite showing."). The County relies on Brownfield v. City of Yakima, 612 F.3d 1140, 1146 (9th Cir. 2010) for the proposition that business necessity is met when "significant evidence" would cause a reasonable person to question whether the employee can perform their job duties. This principle requires an individualized, evidence-based assessment, and the record clearly shows that there is a factual dispute over whether the County had significant evidence concerning Howell's abilities to perform her job duties, or instead reacted to a single incident with an unnecessarily intrusive evaluation.

The County's argument that the Substance Abuse Evaluation was not administered for the purpose of determining whether she had any disabilities or medical conditions falls flat. Also, whether or not Fung is a medical doctor is not a factor on which this Court must base its determination. Fung is unarguably a health care professional, and was hired by the County to determine whether Howell had a mental health disorder, *i.e.*, a substance abuse problem, as admitted by the County. The County ignores these three factors of the EEOC's seven-factor test. The County skips over these factors, but then claims that even if the evaluation was a medical examination, the evaluation did not violate the ADA because it was job-related and consistent with business necessity. See ECF No. 105, 26:9-10. This is false. The County lists Howell's duties as directors and, claims that a substance abuse problem would clearly affect a person's ability to perform these essential job

25

functions, and claims that it "had an objective reason to believe Howell could have a substance abuse problem which would impact Howell's ability to perform her job duties." See id., 26-27. Again, this is a fact intensive inquiry, the facts for which are disputed.

Here, the County never provided Howell with prior notice of concerns regarding her perceived behavior, despite now claiming that they had reasonable concerns that she could not perform the essential functions of her position. Thomas testified that the County had never provided Plaintiff with written notice that it had concerns with Plaintiff's ability to meet expectations, nor did it ever provide Plaintiff with written notice that she was failing to meet expectations.[56] Instead, on Plaintiff's most recent performance review, Plaintiff's performance was described as either exceeding requirements or meeting requirements in every category.[57] The alleged multitude of complaints only came *after* the County required Howell to undergo the medical examination. Perhaps the most critical demonstration that the County's alleged "fitness for duty" examination was not job-related and consistent with business necessity is deposition testimony from Janice Fung. When asked if the County provided Ms. Fung with its class specification for the WCHSA Director, Ms. Fung stated the County did not because she "was hired to do a substance abuse evaluation. [she] was not hired to do fitness for work."[58]

The County repeatedly stated under oath that it hired Ms. Fung to conduct a "fitness-for-duty evaluation" to determine if Plaintiff was under the influence of something, but strangely, the County never conveyed that to the substance abuse counselor it hired to perform the alleged fitness for duty evaluation.[59]

> **Attorney Villanueva:** Are you familiar with the cognitive demands of the HSA director?

---

[56] Exhibit 33 at p. 38:4-7 and 9-12.
[57] Exhibit 15, at p. 40:20-23.
[58] Exhibit 6 at p. 44:4-21.
[59] Exhibit 34 at p. 36:14-16; Exhibit 6 at p. 44:4-21.

| | |
|---|---|
| **Janice Fung:** | That wasn't relevant to my substance abuse evaluation. |
| **Attorney Villanueva:** | Did you ever discuss with Amber whether Amber believed she could perform the specific responsibilities of her job? |
| **Janice Fung:** | Say that again. |
| **Attorney Villanueva:** | Did you discuss with Amber whether Amber believed she could perform the specific responsibilities of her job? |
| **Janice Fung:** | We did not discuss that. |
| **Attorney Villanueva:** | Why not? |
| **Janice Fung:** | That's not part of a substance abuse evaluation.[60] |

Thus, even if the County could characterize the substance abuse evaluation as a "fitness for duty" exam, the disputed facts preclude summary judgment as there is a clear question of fact as to whether the County had "significant evidence" to support its demand for a substance abuse evaluation.

The County's attempt to relabel a DSM-driven, medical health professional administered, multi-session evaluation as a non-medical "fitness for duty" inquiry should be denied by this Court. The record demonstrates that a reasonable jury could conclude the County required a medical examination under 42 U.S.C § 12112(d)(4)(A). Further, the County has not met its burden to show by significant, undisputed evidence that the exam was job-related and consistent with business necessity. As such, the genuine disputes of material fact require denial of the motion on this issue.

### e.  Retaliation for Engaging in Protected Activity

A claim of retaliation under Title VII is governed by the three-step burden-shifting framework under McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). Koch v. Unum Grp., No. 24-6634, 2025 WL 3124478 *1 (9th Cir. Nov. 7, 2025). To establish a prima facie case of retaliation, a plaintiff must prove that (1) she engaged in a protected activity; "(2) [her] employer subjected [her] to adverse employment action; and (3) there was a causal link

---

[60] Exhibit 6 at pp. 44-45.

between the protected activity and the employer's action." Kama v. Mayorkas, 107 F.4th 1054, 1059 (9th Cir. 2024). "Under the McDonnel Douglas framework, the requisite degree of proof necessary to establish a prima facie case [of retaliation] on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence." Opara v. Yellen, 57 F.4th 709, 722 (9th Cir. 2023). "For purposes of a retaliation claim, an employment action is adverse if it would dissuade a reasonable worker from making a claim of discrimination." Williams v. Modly, 796 Fed.Appx. 378, 380 (9th Cir. 2020).

The County argues that Howell cannot establish the second element of the three-step framework as she did not suffer an adverse employment action when the County initiated its investigation and recommended her termination. The County cites to Williams, to support its contention that the investigation was not an adverse employment action, however, fails to include the recommendation for termination in its analysis. Williams is distinguishable from the case at hand. In Williams, the investigation was related to an employee's reasonable accommodation and actions that took place during said accommodation. See id. at 380. The Court in Williams stated that an investigation "may in some instances be considered an adverse employment action. . . ." Id. Further, the Court held that an issuance of a "Letter of Caution" could not be considered an adverse employment action because "it could not have changed the conditions of [the employee's] employment . . . because it was unpublicized and not even issued until after she had taken permanent leave from work." Id.

Here, Howell asserts that only after the County received notice of her potential disability did it begin an investigation into complaints it received of behavior, many of which occurred more than three years prior to the investigation. See Supra. Further, the recommendation for termination was clearly an adverse employment action, as the decision would be brought before the Board of County Commissioners in a public setting, and was meant to change the conditions of Howell's employment

with the County.  As such, any reasonable jury could conclude that the investigation, which resulted from a complaint directly related to Howell's disability, and a recommendation for termination from the County Manager were indeed adverse employment actions.

Also, the County's argument that the investigation commenced prior to her engaging in any protected activity, *i.e.*, hiring counsel, misstates that timeline.  It is clear from the facts asserted in the SAC and by testimony from the County's witnesses, the County informed Plaintiff that Plaintiff was under investigation for alleged misconduct only (2) days after Janice Fung determined that Howell did not meet the criteria

for a substance use disorder but instead was "experiencing professional and personal stress."[61] Howell began engaging in a protected activity on at least May 1, 2023, of which the County was aware.  In Timmons v. United Parcel Service, Inc., 310 Fed.Appx. 973, 975 (9th Cir. 2009), Timmons alleged he was constructively terminated for complaining about the ill treatment of his employer. However, the Court found that the working conditions that Timmons claims forced him to resign were the cause of his complaints, not a response to them.  Here, Howell was forced to resign because of the adverse action taken by the County against her, *i.e.*, the investigation resulting from behaviors caused by her disability and the resulting recommendation for termination.  The County escalated its actions only after Howell engaged in protected activity, and a reasonable jury could conclude that these actions would dissuade a reasonable employee from engaging in the same.  As thoroughly discussed above, the temporal proximity between Howell's protected activity and the County's adverse actions supports an inference of retaliation.  The County's reliance on self-serving declarations, made after the fact, denying retaliatory motive does not eliminate factual disputes at the summary judgment stage.

---

[61] Exhibit 5 at p. 3; Exhibit 6 at p. 21:2-15.

Regarding the County's argument that Howell's claim for retaliation should be dismissed as she seeks compensatory damages, this too should be denied. Howell's request is procedural, not substantive and can be cured by limitation at trial, if necessary. The County attempts to use the damage issue as a gateway to dispose of Howell's entire retaliation claim, which is inappropriate. In Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 345, 131 S.Ct. 2541, 2548, 180 L.Ed.2d 374 (2011), the plaintiffs did not request compensatory damages. In Walsh v. Nevada Dept. of Human Resources, 471 F.3d 1033, 1037 (9th Cir. 2006), the Court found that plaintiff lacked standing to request injunctive relief. Thus, neither Court addressed the issue of compensatory relief requested, which is clearly allowed by statute. As such, this argument should be denied.

## III.    CONCLUSION

Based on the evidence and law, Defendant's Motion for Partial Summary Judgment should be DENIED.

Dated this 11th day of March 2026.

By: _/s/Silvia U. Villanueva_
KENDRA J. JEPSEN, Esq.
Nevada State Bar No. 14065
SILVIA U. VILLANUEVA, ESQ.
Nevada State Bar No. 13608
*Attorneys for Plaintiff, Amber Howell*

**<u>CERTIFICATE OF SERVICE</u>**

Pursuant to FRCP 5(b), I certify that I am an employee of BLACK & WADHAMS, that I am over the age of 18 and not a party to the above-referenced matter, and that on the date below I filed and served the   **PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT** by the method(s) indicated below:

■   **BY NOTICE OF ELECTRONIC FILING**: through Electronic Case Filing System of the United States District Court, District of Nevada, to the individuals and/or entities at their email addresses as set forth below:

> Michael W. Large, Esq.
> mlarge@da.washoecounty.gov
> Lindsay Liddell, Esq.
> lliddell@da.washoecounty.gov

☐   **BY HAND DELIVERY VIA COURIER**: by causing hand delivery of the Document listed above via _____ to the persons at the addresses set forth below:

☐   **BY MAIL**: by placing the Document listed above in a sealed envelope with postage thereon fully prepaid in the United States Mail at Reno, Nevada, and addressed as set forth below.  I am readily familiar with my office's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with the U.S. Postal Service on _____ with postage thereon fully prepaid in the ordinary course of business.

DATED this 11th day of March 2026.

_____*/s/ Natasha Kiernan*_____
Employee of Black & Wadhams

31