# EXHIBIT 6

EXHIBIT 6

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA
-o0o-

| | |
|---|---|
| AMBER HOWELL, | : Case No. |
| | : 3:24-cv-00280-CSD |
| Plaintiff, | : |
| vs. | : |
| WASHOE COUNTY, a political subdivision of the State of Nevada and DOES I-XX, | : |
| Defendants. | : |

==================================================

DEPOSITION OF

JANICE FUNG

November 6, 2025

Reno, Nevada

Reported by: DIANNE M. BRUMLEY, NV CCR #205
California CSR #6796

NV Firm Lic. #053F

APPEARANCES

FOR THE PLAINTIFF:
SILVIA U. VILLANUEVA
Black & Wadhams
50 W. Liberty Street, Suite 1100
Reno, NV 89501

FOR THE DEFENDANTS:
BRANDON PRICE
Deputy District Attorney
Washoe County District Attorney's Office
One South Sierra Street
Reno, NV 89501

FOR THE DEPONENT MS. FUNG:
JOE M. LAUB
Laub and Laub
1148 Ski Run Blvd.
South Lake Tahoe, California

INDEX


| EXAMINATION BY | PAGE |
|---|---|
| Ms. Villanueva | 4 |

EXHIBITS

| EXHIBITS | PAGE |
|---|---|
| Exhibit 1 - December 22, 2023 e-mail string | 14 |
| Exhibit 2 - Certificate of Custodian of Records, and Substance Abuse Evaluation | 21 |
| Exhibit 3 - Consent for the Release of Confidential Information | 21 |
| Exhibit 4 - December 10, 2023 e-mail | 51 |

***

RENO, NEVADA, THURSDAY, NOVEMBER 6, 2025, 1:50 P.M.

***

JANICE FUNG

having been duly sworn,

was examined and testified as follows:

EXAMINATION

BY MS. VILLANUEVA:

Q All right. Please state and spell your full legal name.

A My first name is Janice, J-a-n-i-c-e, my middle name is Wahjun, W-a-h-j-u-n, and then my last name is Fung, F-u-n-g.

Q Have you ever used any other names?

A Nope.

Q And have you ever been deposed before?

A No.

Q So I'm going to give you some helpful tips. So I want to start by letting you know that this is simply -- right now I'm gathering information. I'm not trying to trick you or otherwise twist your words.

Also, this is not an agility or endurance test, so if you need a break or want to take a moment to use the bathroom, please let me know and we'll go off the record. I only ask that before we go off the record,

you answer the question that's pending.

I think one of the most important things is we're trying -- one of the most important things that we're trying to do here is get a clean record, so please use complete words or sentences when responding to answers. Try and avoid gestures and "uh-uh's", "huh-uh's" because those don't transcribe well. So long as you verbalize your response, we should be in good shape. Do you understand?

A I do.

Q As we just observed, you were sworn in by the court reporter. That's the same oath you would take in front of a Judge or jury in this case. Are you aware of that?

A Yes.

Q Okay. You're going to be held to the same level of truthfulness as you would if you were testifying in front of a Judge or jury. Do you understand?

A Yes.

Q I'm going to try and talk slower as well because we've done a lot of these over the last few days and I know the court reporters have asked us to slow down, so I'm going to have to remind myself, and I'll just let you know if we can try and avoid talking too

quickly, it's really helpful for the reporter.

I also want to share with you that while you're not required to provide guesses, I am entitled to estimates. For example, if I ask that you describe what the living room in my house looks like, you would have to guess because you've never seen my living room, you've never been to my house. However, if I ask you to estimate the length of this table, I am entitled to a response. Do you understand?

A I do.

Q Finally, you're going to be given the opportunity to review the transcript and make changes you deem appropriate. I will caution you if you make any material changes, though, we could bring those changes to the attention of the trier of fact and in this case it is going to be the jury.

A Do you mean this transcription?

Q Yes, yes. One more thing, I always forget this, you obviously -- I'm assuming you're her counsel?

MR. LAUB: Correct.

BY MS. VILLANUEVA:

Q You're going to hear him object to things, and so if he objects, you still have to answer and he and I are going to deal with any objections that may arise -- any objections or any evidentiary issues later, but as

far as today, any objections that are put on the record are fine, he's allowed to do that, but you still have to provide a response, okay?

All right. Are you currently under the influence of any drug or substance that would impair your ability to understand my questions or respond honestly and coherently today?

A No.

Q Have you taken any intoxicating substances in the last 24 hours?

A No.

Q Who is your current employer?

A I'm self-employed.

Q And what is the name of the entity that you are self-employed with?

A It goes under my name, Janice Fung.

Q Okay. Is it a self-proprietorship?

A Sole proprietor.

Q And so how long with your current employer?

A Twenty-four years.

Q And what is your job title?

A Substance abuse counselor.

Q And how long at that position?

A I have been licensed since 1989.

Q And what date -- well, what date did you begin

with your sole proprietorship business?
A Probably 24 years ago.
Q Do you have any criminal records?
A No.
Q Have you ever been convicted of anything besides a traditional parking citation or anything like that?
A No.
Q Did you attend high school?
A Yes.
Q When?
A I graduated in 1980.
Q And where?
A From Naples American High School.
Q And did you attend college?
A I did.
Q Where?
A First two years were University of Maryland in Munich, and then I finished up at University of Colorado, Boulder.
Q And how many years at Colorado Boulder?
A Two.
Q And did you graduate from Colorado Boulder?
A Yes.
Q Okay. And what was the degree you obtained?

A Oh, boy, you're asking from a long time ago. It was speech -- it was basically speech pathology. It was communication -- I don't remember the exact title of it.

Q Was that a Bachelor's degree?

A It was.

Q And do you have any graduate degrees?

A I do.

Q And what are those?

A I have a Master's of counseling.

Q Okay. That just reminded me, one more thing. I will try not to talk over you. Occasionally you'll notice that it's difficult to kind of talk slowly and not talk over one another because traditional, in conversations it happens, but if it happens, I'll just remind you. I'm not trying to be offensive or anything like that, it's really again for the court reporter.

So will you repeat your graduate degrees for me, please?

A I have a Master's in counseling and educational psychology.

Q And where did you obtain your Master's?

A University of Nevada, Reno.

Q And do you have any certifications?

A I've been licensed by the State of Nevada as a

substance abuse counselor since 1989, I believe.
Q And is that your only certification?
A Yes.
Q And do you hold any professional licenses?
A Just that one.
Q And do you have a license number that you use?
A I do. 631L is what I believe it is.
Q And did you say you're a licensed drug and alcohol counselor?
A Correct.
Q Do you know if your license is governed by the Board of Examiners for Alcohol, Drug and Gambling Counselors?
A It is.
Q Have you ever been disciplined by the -- have you ever been disciplined by the regulatory authority that issued you the license?
A No.
Q As a licensed drug and alcohol counselor, is it accurate to say that you engage in the clinical practice of counseling persons with alcohol and other substance use disorders?
A Yes.
Q Before you applied for your license as a drug and alcohol counselor, were you required to complete a

certain amount of post-graduate supervised clinical hours?

A The question comes from a long time ago. I believe we did have hours. The number, I can't tell you, but I did, and back then when I got licensed, it was the Bureau of Alcohol and Drug Abuse. So over the course, it's changed many times, actually probably two or three times.

Q Okay. As part of those clinical hours, were you required to complete a certain amount of hours counseling persons with mental illness?

A No.

Q Do you have any experience providing services to persons with mental illness?

A I do.

Q Does your license authorize you to diagnose clients?

A With a mental health disorder?

Q Just diagnose.

A My license only allows me to diagnose a substance use disorder.

Q Okay. And are you a licensed social worker?

A No.

Q Have you ever served in the military?

A No.

Q How did you first learn you were going to testify in this matter?
A I don't know. I think I got something from you guys.
Q Did you receive papers?
A I did.
Q Were you served with papers?
A I was, I was.
Q Were you represented by a lawyer at that time?
A Yes.
Q And what did you do when you received those papers?
A Do you mean the papers for me to come here?
Q Uh-huh. Sorry, I said "uh-huh". Yes, the papers that you received to notify you regarding this deposition.
A What did I do with those papers?
Q What did you do? What action did you take?
A I read them and I tried to understand them, and the dates and the times, we spoke of it. I think they talked about a 1:00 a.m. time. I tried to get clarification.
Q Okay. Did you call a lawyer?
A No. I think we had spoken about it prior.
Q Why didn't you call a lawyer or your lawyer?

A I'm not understanding your question.

Q Why didn't you call a lawyer when you received the papers?

A I didn't think that I needed to.

Q Did Washoe County's lawyers contact you?

MR. LAUB: Objection, vague.

BY MS. VILLANUEVA:

Q After you received the papers to notify you of this deposition, did Washoe County's lawyers contact you?

A No, they did not.

Q Did you receive any letters from Washoe County's lawyers?

MR. PRICE: Objection, vague and ambiguous.

BY MS. VILLANUEVA:

Q You can still answer.

A So ask the question again.

Q Did you receive any letters from Washoe County's lawyers?

MR. PRICE: Objection, vague and ambiguous.

THE WITNESS: I didn't receive anything from the Washoe County District Attorney's Office.

BY MS. VILLANUEVA:

Q Did you receive anything from Washoe County's lawyers? I didn't say anything about the District

Attorney's Office, I just said did you receive anything from lawyers who represented themselves to be Washoe County's lawyers?

A I did not.

Q Did you get any offers from lawyers to represent you?

MR. PRICE: Objection, relevance.

THE WITNESS: No.

BY MS. VILLANUEVA:

Q Did you sign a written agreement with lawyers from Washoe County?

A No.

Q So we'll jump to Exhibit 1. I'm going to give her this and she's going to mark them and then she'll give them to you.

(Exhibit 1 was marked.)

BY MS. VILLANUEVA:

Q You'll see they're labeled, you'll see Exhibit 1. I'll give you some time to take a look at it. Are you familiar with this document?

A I am.

Q So you'll see that they're Bates stamped WC06207. Do you see that number at the bottom?

A I do.

Q Okay. And there's an e-mail lower part of the

page, it starts with Patricia. Do you see that?
A I do.
Q Will you please read the paragraph just below Patricia?
A "I received this from Amber's attorney. I have given directly to Amber all of her records, at least once. Can you please run this by your legal team and give me approval or disapproval to release them to the attorney. Thanks."
Q Did you write that?
A I did.
Q Did you send that to Patricia Hurley?
A I did.
Q Why?
A Washoe County hired me to do the evaluation, so I sent the report to them and then I got the request from, I don't remember -- I don't know if you guys were the attorney on file at the time, so I wasn't sure if I was allowed to send it or not because I had been hired by the county.
Q Did Patricia respond to this e-mail?
A I think she said she was going to run it by their legal team.
Q Did she run it by -- or did she ever respond to this e-mail? Did she respond to you?

A I can't recall.
Q Okay. Did Washoe County's team, their attorneys respond to you?
A I don't remember the sequence of events, but at some point I think Michael Large contacted me and I was told I could release this.
Q Did he say anything else to you?
A No.
Q Did you discuss Amber Howell?
A I don't think so.
Q What does that mean? What does "I don't think so" mean?
A We did not discuss her case. We did not discuss her evaluation.
Q Approximately how many times have you asked someone from the county to run something lie it is by itself legal team?
A That was the only time because that's the only time I've ever received a request for a client's records.
Q Okay. The deposition subpoena we sent to you which you acknowledged you received, it included a request for documents. It said, "All written, typed, and electronically stored communications, including, without limitation, e-mails, text messages, video

recordings, voice memos and voice messages related to, or regarding, Amber Howell, between you and, one, Patricia Hurley, and two, you and Kate Thomas from January 1, 2023 through present."

Did you bring this Exhibit 1 with you today?

A I did not.

Q Why not?

A It has no clinical data in it.

Q Is this an e-mail between you and Patricia Hurley?

A Yes.

Q Do you think you should have brought that e-mail with you?

A I don't know the answer to that.

Q What other e-mails did you not bring with you that you should have?

MR. PRICE: Objection, vague and ambiguous, also argumentative.

BY MS. VILLANUEVA:

Q You can answer that.

A Okay. I did look through my files to see what I had. I had this and I had one other e-mail. It was from Patricia with a video they asked me to review when they hired me.

Q What was the video?

A It was of the public hearing. That was when they made the referral to me.

Q Why didn't you turn that over?

MR. LAUB: The video or the e-mail?

MS. VILLANUEVA: The e-mail.

THE WITNESS: Like I said, it was not a clinical document. It was administrative referral information.

BY MS. VILLANUEVA:

Q Are there other written communications between Janice Fung, you, and employees of the county?

MR. PRICE: Objection, vague and ambiguous.

THE WITNESS: Are you asking me -- rephrase your question, please.

BY MS. VILLANUEVA:

Q Did you receive other written communications from individuals at the county?

MR. PRICE: Objection, vague and ambiguous.

THE WITNESS: Regarding any person, or regarding Amber Howell?

BY MS. VILLANUEVA:

Q Regarding Amber Howell.

A No, no.

Q And after you and Patricia had this communication, did you discuss this communication over

the phone?
A Yes.
Q And what day was that?
A I don't recall.
Q Approximately what time frame?
A A year, year-and-a-half ago, probably right after.
Q So this e-mail is dated between December 10th and December 11th.
A Correct.
Q Was it a couple days after this e-mail?
A I don't recall.
Q I am entitled to an estimate, so a couple days after this e-mail?
MR. LAUB: If that's the best answer she can give, then that's what she's entitled to provide.
BY MS. VILLANUEVA:
Q So was it more or less -- was it after this communication, do you recall that?
MR. LAUB: Objection, I don't understand the question.
BY MS. VILLANUEVA:
Q Was your discussion with Patricia Hurley after this e-mail occurred?
MR. PRICE: Objection, vague and ambiguous.

THE WITNESS: I cannot recall when I spoke to Patricia after this e-mail. I don't remember.

BY MS. VILLANUEVA:

Q So you did speak with her after this e-mail, that's all you remember?

A I did, I did.

Q Have you reviewed any documents or photographs in preparation for your deposition today?

A I reviewed my report and I saw something on the Internet pertaining to this case that I looked at and that was it.

Q Did you review any photographs?

A Photographs of what?

Q Just photographs in preparation for today.

A No.

Q Did you bring any of those documents with you today?

A Just my evaluation.

Q Between last week and this week, have you spoken with anyone from the county?

A No.

Q At any point between Monday of this week and today, did you speak with Patricia Hurley?

A No.

Q What about Kate Thomas?

A No.
Q So we'll jump to Exhibit 2.
(Exhibit 2 was marked.)
BY MS. VILLANUEVA:
Q I'll give you a moment to just review. Does Exhibit 2 look familiar to you?
A It does.
Q Do you recall receiving a subpoena duces tecum earlier this year requesting you provide us with all documents and written correspondence in your possession related to Amber Howell?
A I do.
Q Is it accurate to say that Exhibit 2 contains all the documents you provided to our office?
A That's correct.
Q So we're going to go to Exhibit 3.
(Exhibit 3 was marked.)
BY MS. VILLANUEVA:
Q Does this document look familiar to you?
A It does.
Q Did you ask Amber to sign a Consent for Release of Confidential Information?
A I did. She signed one at the onset of the evaluation.
Q Was it similar to Exhibit 3?

A It is.

Q Why did you ask Amber to sign a Release of Information form?

A You mean at the onset of the evaluation?

Q Yes.

A Whenever I do an evaluation, it's standard practice to have my client sign a release to whoever the report is going to.

Q Did Amber provide you with a signed release?

A She did.

Q Why wasn't a copy of the signed release provided to us?

A I printed off the report off the computer and that's what I submitted to you. I had not scanned the release, so --

Q Do you have that signed release?

A I do. I could probably find that.

Q Why didn't you bring it with you today?

A Again, not a clinical document.

Q What else didn't you provide to us that you should have?

MR. PRICE: Objection, argumentative.

THE WITNESS: A copy of the release and a copy of this e-mail that I sent to Patricia and the e-mail that they sent me with a copy of the video for me to

look at.

BY MS. VILLANUEVA:

Q Will you provide that signed release to us?

A I could look for it.

Q You don't know if you have it any more?

A I believe I can find it.

Q Will you provide it to us?

A Yes. If I can find it, I will provide a copy to you.

Q Okay, thank you. Did you speak with someone at the county about Amber's evaluation prior to Amber providing you with a signed release?

A No. Actually, phrase that -- ask me the question again.

Q Did you speak with someone at the county about Amber's evaluation with you prior to Amber providing you with a signed release?

MR. PRICE: Objection, vague and ambiguous.

THE WITNESS: Can you restate your question, please?

BY MS. VILLANUEVA:

Q You mentioned earlier that Amber gave you a signed release.

A Correct.

Q Before Amber gave you that signed release, did

you talk to anyone at the county about Amber's evaluation?

MR. PRICE: Objection, vague and ambiguous.

THE WITNESS: Yes, I did. The county called me to ask if I could do an evaluation on one of their employees, so --

BY MS. VILLANUEVA:

Q Did you talk with anyone about Amber's evaluation with you?

MR. PRICE: Objection, vague and ambiguous.

THE WITNESS: Please rephrase your question.

BY MS. VILLANUEVA:

Q Before Amber gave you a signed release, before you had the signed release in your hand, did you talk to anyone at the county about your evaluation with Amber?

A I had not evaluated Amber before I had seen her.

Q After Amber provided you with a signed release, did you provide the county with information regarding your evaluation of Amber?

A Yes. After I completed her evaluation, I submitted a report.

Q Prior to submitting a report, did you have any other conversations with someone at the county?

MR. PRICE: Objection, vague and ambiguous.

THE WITNESS: I advised them, Patricia, that she had made it to her appointment. That is my standard policy when the county refers somebody to me. I will tell them the date of the evaluation and if that person shows up.

BY MS. VILLANUEVA:

Q And what else did you discuss?

A That was it.

Q And who did you speak with at the county about that conversation?

A Patricia.

Q Did you speak with anyone else?

A No.

Q How many times did you and Amber meet in person? And if you're referencing an exhibit, just let the reporter know which exhibit you're referencing.

MR. PRICE: I'm assuming you're asking with regard to the evaluation, right?

BY MS. VILLANUEVA:

Q I can specify. How many times did you meet -- excuse me, how many times did you and Amber meet for an evaluation or for purposes of evaluating Amber?

A So my first meeting with her was on April 12th over Zoom.

Q Are you referencing a document?

A I'm referencing Exhibit 2, and all of the dates of the evaluation are notated there.

Q Okay. I'm sorry, I'll reask the question just so we can get a clean record. How many times did you and Amber meet in person for you to evaluate her?

A In person, it was three times.

Q And you're referencing what document -- are you referencing a document to ascertain that?

A Correct.

Q And that's exhibit --

A Exhibit 2.

Q And not in person, how many times did you meet with Amber?

A Once on April 12th.

Q Okay. So you met with Amber on April 12th. That was the first time you met with her?

A Correct.

Q And that was a Zoom meeting?

A Correct.

Q You mentioned earlier in your testimony that you are a licensed drug and alcohol counselor. Did you and Amber meet so you could provide Amber with counseling?

A I met to perform a substance abuse evaluation.

Q Do you provide clients of yours with counseling

evaluations?

MR. LAUB: To better understand the question, are you asking if while she's doing her evaluation that she also provides counseling?

MS. VILLANUEVA: I'm just asking in general.

BY MS. VILLANUEVA:

Q Do you regularly provide counseling evaluations? So evaluations containing counseling services.

MR. PRICE: To anyone?

MS. VILLANUEVA: Yes.

THE WITNESS: My practice is substance abuse evaluations. Very occasionally do I do counseling.

BY MS. VILLANUEVA:

Q But you do offer counseling services?

A I do not.

Q You do not. So you do not provide counseling to any of your clients?

A That's not what I said. I said occasionally I provide counseling services to my clients.

Q So you provide counseling services to your clients occasionally?

A Correct.

Q So you offer counseling services?

A Occasionally I perform counseling sessions.

Q How would you describe your counseling sessions?
MR. PRICE: Objection, relevance.
MR. LAUB: Objection, vague.
THE WITNESS: Restate your question, please.
BY MS. VILLANUEVA:
Q You mentioned earlier in your testimony that you offer counseling sessions occasionally; is that correct?
A That's correct.
Q Describe those counseling sessions.
MR. PRICE: Objection, relevance. It's also vague and ambiguous.
THE WITNESS: A counseling session is when somebody comes to my office and they present with an issue that we discuss.
BY MS. VILLANUEVA:
Q What type of issue -- are you limited in scope to what those issues may involve?
A Yes. I'm limited in scope pertaining to substance abuse.
Q Okay. What about mental health?
MR. PRICE: Objection, asked and answered.
THE WITNESS: I do not do any mental health counseling.

BY MS. VILLANUEVA:
Q What did you and Amber discuss during your evaluation of Amber?
A I performed a substance abuse evaluation.
Q Okay. And what does that pertain?
A It's an interview and we discussed her social history growing up, we discussed her education, we discussed her employment, we discussed her medical, we discussed her legal, we discussed her substance abuse, or substance use.
Q Did you inquire into Amber's mental state?
A Yes.
Q Why?
A That's part of a substance abuse evaluation.
Q Did you discuss whether Amber suffers from anxiety?
A She reported having anxiety.
Q Did you discuss it?
MR. LAUB: Objection, vague. What do you mean by discuss it?
BY MS. VILLANUEVA:
Q You said in your testimony Amber reported having anxiety. After she reported having anxiety, did you discuss her anxiety?
A No, I did not.

Q Why not?
A Because that would go into mental health counseling and I do not do mental health counseling.
Q Did you discuss whether Amber struggles with an eating disorder?
A As part of my evaluation, I ask about eating disorders.
Q Why?
A That's part of a substance abuse evaluation.
Q Was the inquiry into whether Amber has an eating disorder related to Amber's ability to perform her job duties with the county?
MR. PRICE: Objection, lacks foundation, also calls for speculation.
MR. LAUB: Calls for speculation, objection.
THE WITNESS: Asking about eating disorders, sleep disorders, mental health disorders is standard protocol practice for a substance abuse evaluation.
BY MS. VILLANUEVA:
Q Did you discuss whether Amber has ever experienced a psychiatric hospitalization?
A Yes, I did.
Q Why?
A That's part of a substance abuse evaluation.
Q Why is it part of a substance abuse evaluation?

A When I perform a substance abuse evaluation, I am looking at a person holistically, so it is important to note if somebody has a mental health disorder, psychiatric hospitalizations, suicide attempts, self-harm behaviors. That's protocol for a substance abuse evaluation.

Q So you needed to determine whether she had a mental health disorder?

A Correct.

Q Did you discuss whether Amber has ever attempted suicide?

A I did.

Q Why?

A Again, that is part of a standard substance abuse evaluation.

Q And why is that part of a standard substance abuse evaluation?

A It is part of it so if somebody has a substance use disorder and if they have a history of attempting suicide, we would want to know that in making our treatment recommendations of how we're going to proceed.

It was not pertinent to Amber because she does not have -- at that time she did not have a substance abuse diagnoses.

Q Did you discuss whether Amber had ever engaged

in self-harm?
A Again, yes, I did, as part of a routine substance abuse evaluation.
Q Why did you ask -- excuse me. Why is it part of a routine substance abuse evaluation?
A For the same reason as far as suicide attempts.
Q Did you discuss with Amber whether she had experienced trauma?
A I did.
Q And why?
A That is part of the substance abuse evaluation.
Q And why is it part of a substance abuse evaluation?
A If a person has trauma in their history, it places them at a higher risk for having developed a substance use disorder.
Q Did you inquire into Amber's physical health?
A I did.
Q Did you ask her her height?
A I did.
Q Why?
A Again, part of the standard substance abuse evaluation.
Q Was the inquiry into Amber's height related to Amber's ability to perform her job duties with the

county?

MR. PRICE: Objection, lack of foundation, also calls for speculation.

THE WITNESS: I was hired to perform a substance abuse evaluation and a substance abuse evaluation includes a medical history, including height and weight, and the purpose of that is if somebody has had a significant weight difference between now and back then, it could be significant of a substance use disorder.

BY MS. VILLANUEVA:

Q What about her height, how is that related to a substance abuse --

A Height related to weight, the ratio. It's standard protocol.

Q So you mentioned you asked Amber how much she weighed?

A I believe I did.

Q Did you ask Amber how much she weighed?

A Yes. She told me she was 178 pounds with no recent changes to her weight.

Q And why did you ask her how much she weighed?

A Again, it is --

MR. LAUB: Objection, asked and answered.

BY MS. VILLANUEVA:

Q I'm still entitled to an answer.

A It's part of the standard substance abuse evaluation.

Q Was the inquiry into Amber's weight related to Amber's ability to perform her job duties with the county?

MR. PRICE: Objection, calls for speculation, also lacks foundation.

THE WITNESS: I was hired to do a substance abuse evaluation to determine if she had a substance use disorder, and if she did, if she needed treatment and what type. I was not hired to determine her fitness for work.

BY MS. VILLANUEVA:

Q Did you ask Amber whether she was taking any prescribed medications?

A It is part of my regular substance abuse evaluation, and when I was looking at my report I did not notate the medications, but I did notate that she was being treated by one physician and one pharmacist, so --

Q Maybe I just misheard. So did you ask Amber whether she was taking any prescribed medications?

A It's not contained in my report. Normally I

would state she is taking the medications and what they are, but for whatever reason, this one I did not.

Q Do you recall asking Amber whether she was taking any prescribed medications?

A I did ask her because I referenced that she was only using one doctor and one pharmacy, and the reason for that question is to find out if somebody is doctor shopping, pharmacy shopping.

Q Did Amber share with you whether she was taking prescribed medications?

A She did.

Q Did she give you the names of those prescribed medications?

A I don't recall.

Q Did you discuss with Amber whether she suffered from high blood pressure?

A She reported that.

Q Do you recall if you asked her?

A I asked her if she had any medical conditions.

Q Why?

A Again, that is part of a standard substance abuse evaluation.

Q I'm sorry, you said medical conditions, is that what you said? If I'm misstating your testimony, please correct me. What -- actually, let's have the transcript

provider, can you just repeat her answer?
(The record was read by the reporter.)
BY MS. VILLANUEVA:
Q How is asking about medical conditions related to a substance abuse evaluation?
A It's part of a standard substance abuse evaluation.
Q Why is that?
A Because it's important to know a person's medical condition in the event they have a substance abuse disorder and I need to refer them for treatment.
Q Did you discuss with Amber whether she suffered from endometriosis?
A She reported that as a health condition.
Q Did you discuss whether Amber was pregnant?
A I asked the question and she said she was not.
Q Was the inquiry into whether Amber was pregnant related to Amber's ability to perform her job duties?
MR. PRICE: Objection, calls for speculation, also lacks foundation.
THE WITNESS: Asking a client if they are pregnant is part of a substance abuse evaluation. If a client with a substance use disorder is pregnant, they go to the top of a waiting list for treatment, so it is a standard question that I ask.

BY MS. VILLANUEVA:
Q Did you discuss whether Amber engages in exercise?
A I did.
Q Why?
A It's part of the evaluation.
Q And why is her involvement in exercise part of a substance abuse evaluation?
A It's looking at the person in whole.
Q Was there inquiry into whether Amber exercises related to Amber's ability to perform her job duties?
A No.
Q Did you diagnose Amber as experiencing stress?
A I did not.
Q So we're going to look at Exhibit 2 and these ones are not Bates stamped. I don't know why I didn't use the Bates stamped ones, but these ones are not Bates stamped. We'll go to the fourth page of Exhibit 2 and actually at the bottom, it does say Page 3 of 5, but it's the fourth page of the exhibit.
A So you're referencing under Impressions and Recommendations?
Q If you go down under Impressions and Recommendations, that's correct. See it's in bold, that paragraph, and then there's a paragraph below where

where it says, "It appears that," do you see that?
A I do.
Q Will you read that sentence for me?
A "It appears that Amber is experiencing professional and personal stress and may be at risk for developing a substance use disorder, so the following is recommended."
Q So is that not a diagnosis?
A That is not a diagnosis.
Q What is that?
A It appears, she reported the stressors, she reported her history of trauma. That was not a diagnosis. If somebody self-reports, that is not a diagnosis.
Q Is stress a mental health illness?
MR. PRICE: Objection, lack of foundation. She also lacks the requisite qualifications to answer that question.
MR. LAUB: Also objection, vague and requires speculation.
BY MS. VILLANUEVA:
Q You can still answer.
MR. LAUB: If you can.
THE WITNESS: I can answer that. I am a substance abuse counselor and I diagnose substance abuse

disorders. I do not diagnose mental health disorders, so that was not the scope of my practice. That is not what I was hired for.

BY MR. VILLANUEVA:

Q Why did you include that information in this evaluation?

A That is part of a standard substance abuse evaluation.

Q Did you recommend treatment for Amber?

A I recommended individual counseling, supportive counseling based on her having reported stress in her life.

Q Is it possible that your evaluation of Amber had the potential to elicit non visible illnesses that Amber may have had?

MR. PRICE: Objection, relevance. It's also vague and ambiguous.

MR. LAUB: And calls for speculation.

THE WITNESS: Please restate your question.

BY MS. VILLANUEVA:

Q Is it possible that your evaluation of Amber had the potential to illicit non visible disabilities that Amber may have had?

MR. PRICE: Objection, relevance. Also vague and ambiguous, it also calls for a legal conclusion.

THE WITNESS: I was hired to perform a substance abuse evaluation. I diagnosed that she had no substance use disorders. She self-reported mental health and trauma. A self-report is not a diagnosis from me.
BY MS. VILLANUEVA:
Q But you provided recommendations for treatment it looks like?
A Right, supportive counseling for the stress that she reported.
Q During your evaluation of Amber, did you conduct a psychological test of Amber to measure personality?
A No.
Q Did you conduct any test with Amber to determine honesty?
A No.
Q Did you conduct any test with Amber to determine preference?
MR. PRICE: Objection, vague and ambiguous.
MR. LAUB: Exact same.
THE WITNESS: Please restate your question.
BY MS. VILLANUEVA:
Q Did you conduct any test with Amber for the purpose of determining preference?

MR. PRICE: Objection, vague and ambiguous. It's also not relevant.

MR. LAUB: I also find the question to be unintelligible. I don't understand the question, so therefore my client may have an inability to answer that question, so if you could possibly rephrase it and maybe describe what you mean by preference.

BY MS. VILLANUEVA:

Q Okay, I can do that.

Did you conduct any tests with Amber to determine preference for decision making? If you don't know, you can say I don't understand the question and that's fine, but my question stands and if you don't understand it, you just say you don't understand the question.

A I did not do any testing to test for preference.

Q Did you conduct any test with Amber to determine habits?

A No.

Q Did you conduct any test with Amber to determine behavioral traits?

A No.

Q Did you recommend that Amber undergo a urine analysis?

A I did. That is part of routine practice for doing an evaluation with the county.

Q And why?

A If a person is being referred to me to determine if they have a substance abuse evaluation, getting an alcohol drug screen is part of the standard procedure that I use.

Q Did you evaluate Amber using a polygraph examination?

A No.

Q Did you evaluate -- excuse me.

Did your evaluation require Amber to undergo a physical fitness test?

A No.

Q Did your evaluation of Amber require Amber to undergo a physical agility test?

A No.

Q Was the purpose of your evaluation to determine if Amber was suffering from an alcohol abuse disorder?

A Yes.

Q Is alcohol abuse -- excuse me.

Is alcohol abuse disorder a mental health condition?

MR. LAUB: Objection, calls for speculation.

THE WITNESS: My license allows me to diagnose

a substance use disorder. A substance use disorder is in the same book of the DSM-5 criteria with other mental health disorders, so we will say yes, a substance use disorder is a mental health disorder. My license only allows to do a substance use disorder diagnoses and that's all that I ever do.

BY MS. VILLANUEVA:

Q Did you recommend Amber undergo a treatment plan?

A I recommended that she do individual counseling to address the stress that she self-reported.

MR. LAUB: Excuse me, her questions are yes and no questions.

THE WITNESS: I'm sorry.

MS. VILLANUEVA: You can say the objection. I would ask that you not coach the witness, though.

MR. LAUB: At the same time you're asking a question and she is running on. I want her to listen to the call of the question and answer the question that you're asking.

MS. VILLANUEVA: But you're coaching the witness. That's not permitted. You can provide objections and keep it limited to your objections and you can provide her counseling before the depo, but at the depo you cannot coach a witness. You know that,

you're a trial lawyer.

MR. LAUB: I understand that.

BY MS. VILLANUEVA:

Q Okay. So we're going to go to -- did the county provide you with the class specification or job description for its HSA director position?

A No.

Q Did you ask the county to provide you with the class specification or job description?

A No.

Q Why not?

A It wasn't relevant to doing a substance abuse evaluation.

Q The county has alleged it hired you to perform Fitness for Duty exam. How could you provide a Fitness for Duty exam if you don't know the job duties for which Amber was responsible?

MR. PRICE: Objection, misstates the evidence.

THE WITNESS: I was hired to do a substance abuse evaluation. I was not hired to do fitness for work.

BY MS. VILLANUEVA:

Q Are you familiar with the cognitive demands of the HSA director?

A That wasn't relevant to my substance abuse

evaluation.

Q Did you ever discuss with Amber whether Amber believed she could perform the specific responsibilities of her job?

A Say that again.

Q Did you discuss with Amber whether Amber believed she could perform the specific responsibilities of her job?

A We did not discuss that.

Q Why not?

A That's not part of a substance abuse evaluation.

Q I think we're all good, so we're all done. Did you want to ask questions, or you?

MR. PRICE: Yeah, I was going to ask some questions. Should we take a five-minute break, give the court reporter a break or --

MS. VILLANUEVA: It's up to you. If you guys want to go on a break --

MR. LAUB: I'm ready to roll. Thank you for the courtesy of that. That was very kind of you.

EXAMINATION

BY MR. PRICE:

Q Good afternoon, Miss Fung. How are you? I think it might be helpful for you to just basically

describe what a substance evaluation is and how you perform a substance abuse evaluation.

A Okay. Would it be okay if I include how I got the referral?

MR. LAUB: No. I think he's asking for in general, not about this case.

THE WITNESS: Okay. So a substance abuse evaluation is an interview. We go over social, growing up, mom and dad, domestic violence between the parents, siblings, childhood, emotional, physical, sexual abuse. We talk about education, did you graduate, were you in special education, do you have a higher level of education.

We talk about employment, we talk about military, we talk about housing, stability, we talk about medical.

She shared very personal information, how tall are you, how much do you weigh, do you have an eating disorder, a sleep disorder, any mental health issues, psychiatric hospitalizations, suicide attempts, are you suicidal now, health insurance, and then we talk about legal history, and then, of course, we talk about alcohol and drugs, what have you used, have you ever had any treatment, how long have you been sober.

BY MR. PRICE:

Q And then what are the -- how do you reach a conclusion on whether or not someone does in fact have a substance abuse disorder? Like what do you do to make that determination?

A I use the DSM-6 criteria for substance use disorder.

Q Okay. So can you explain that a little bit, what the criteria is, how that works?

A So the criteria looks at tolerance, withdrawal, have you used more than intended, have you been using when you should have been taking care of other responsibilities, withdrawal symptoms, criteria like that, functioning, how it's interfered with your functioning, so she did not meet any of that criteria.

Q Okay. Did Patricia Hurley ever direct you to come to a certain conclusion with respect to your substance abuse evaluation of Miss Howell in 2023?

A No.

Q Did Miss Hurley ever direct you to make certain opinions regarding your substance abuse evaluation of Miss Howell in 2023?

A No.

Q Did Miss Hurley ever ask you -- or sorry, did Miss Hurley ever direct you to come to certain

conclusions when you evaluated Miss Howell for a substance abuse evaluation of 2023?

A No.

Q And did she ever direct you to make any certain opinions in your evaluation of Amber Howell in 2023?

A No.

Q Did Patricia Hurley have any input or influence whatsoever when you evaluated Miss Howell in 2023 for a substance abuse evaluation?

A No.

Q Did anybody at the county other than Miss Hurley ever direct you to come to certain conclusions with regard to your evaluation of Miss Howell in 2023?

A No.

Q Did anyone other than Miss Hurley who was employed by the county ever ask you to make any certain opinions regarding Miss Howell's evaluation in 2023?

A No.

Q Did the fact that you were getting paid by Washoe County to conduct the evaluation influence the manner in which you did the evaluation of Miss Howell in 2023?

A No, and I smile because the amount that I got paid for this and what it has come has amounted to nothing, so --

Q And did the fact that you got paid by Washoe County have any influence on the outcome or the recommendations that you made in your evaluation of Miss Howell in 2023?

A No.

Q Do you believe that you made a fair and impartial substance abuse evaluation of Miss Howell in 2023?

A I did.

Q And earlier you testified what the scope is in terms of what you can conclude with regard to your license. Are you a medical doctor?

A No.

Q Are you authorized to make medical diagnoses?

A No.

Q When you evaluated Miss Howell in 2023, did you diagnose her with any medical conditions?

A I did not.

Q And when you evaluated Miss Howell in 2023, did you diagnose her with any mental health conditions?

A I did not.

Q If you could refer back to your evaluation report which was Exhibit 2, will you please just tell us what was the conclusion that you made with respect to Amber Howell when you did your substance abuse

evaluation in 2023?
A That she had no substance use disorders and no substance abuse treatment was recommended.
Q And did you opine on whether or not there was any sort of probability that she could have or develop a substance abuse disorder?
A I thought based upon her history of trauma and the stress that she had reported, that she could have possibly been at risk for developing and those would be standard -- what's the word I'm looking for? Those would be standard indicators of anybody developing a substance use disorder. That would not be specific to Amber. She reported a history of trauma starting early in her life.
Q If you could, under the impressions and the recommendations portion of your report, if you'll look at the last sentence of that paragraph that's titled Impressions and Recommendations, can you just read that last sentence, please?
A "Increased frequency of supervision"?
MR. LAUB: Are you referring to where it starts, "It appears," or, "Individual counseling"?
BY MR. PRICE:
Q Actually, "The results of the substance abuse --"

THE WITNESS: Oh, "The results of the Substance Abuse Subtle Screening Inventory indicate a low probability of having a low substance use disorder."

BY MR. PRICE:

Q So you determined she had a low probability of having a substance use disorder?

A Correct.

Q Have you conducted other substance abuse evaluations for Washoe County employees in the past?

A I have.

Q Okay. And in conducting those other substance abuse evaluations, have there been times when you have determined that the employee you're evaluating does in fact have a substance abuse disorder?

A Yes.

Q And in the past when you've done those other evaluations, have you also concluded in certain cases that the employees do not suffer from a substance abuse disorder?

A Yes.

Q I would like to actually mark an additional exhibit. We can go off the record for a second.

(Exhibit 4 was marked.)

BY MR. PRICE:

Q So that exhibit has been marked as Exhibit 4.

If you can take a look at that, is this copy the same e-mail that Miss Villanueva went over with you before with respect to the December 10th e-mail that you sent Patricia Hurley?
A Yes.
Q And if you could turn to Page WC5212, there's a letter addressed to you from Carla Bankhead who is a paralegal to Kendra Jepsen. Do you see that?
A I see that.
Q So is this the document that was attached to your December 10th, 2023 e-mail to Patricia Hurley?
MR. LAUB: Only if you know.
THE WITNESS: I don't know.
MR. LAUB: We don't want you to speculate.
THE WITNESS: It was a request from one of the lawyers asking, and because Washoe County had hired me, that's why I asked for permission.
BY MR. PRICE:
Q But you're not really sure whether or not this request for medical records was the document that you were asking Patricia about? And that's okay if you don't know.
A I don't know. I received many requests.
Q In connection with this case, Miss Howell produced two audio recordings of sessions that you had

with Miss Howell on April 14th, 2021 and April 21st, 2021. Do you know whether or not Miss Howell was recording the sessions that she was having with you during the substance abuse evaluation?

A Can you say that again, please?

Q Sure. So Miss Howell produced two audio recordings in connection with this case and they were audio recordings of the sessions that you and her had on April 14th, 2023 and April 21st, 2023.

Do you know whether or not Amber Howell was recording any of your substance abuse sessions?

MR. LAUB: Are you asking was she aware of it?

BY MR. PRICE:

Q Yeah, were you aware?

A No.

Q Would you be surprised to learn that she was recording your sessions?

A Yes.

Q Why would that surprise you?

A I've never had anybody record a session, and I'm shocked.

Q Did she ask your permission to record the sessions?

A Absolutely not.

Q So you didn't authorize her to record any of

your evaluation sessions?

A No.

Q And do you generally permit your patients to record evaluation sessions when you evaluate them for substance abuse disorder?

A I've never been asked that, but if I were to be asked that, I would say no.

Q And why would you say no?

A Because that would interfere with the process of the evaluation or counseling session.

Q Why do you say that?

A Because when a person is being recorded, they may not respond as sincerely and genuinely and honestly if they were off record.

Q Those are all the questions I have.

FURTHER EXAMINATION

BY MS. VILLANUEVA:

Q I have a couple more. We're going to go back to Exhibit 2. After the April 12th, 2023 meeting with Amber, did you speak with Patricia Hurley?

A I don't recall, and actually I think I would like to take a restroom break, is that okay?

MR. LAUB: Sure.

MS. VILLANUEVA: Can we just finish the question that was pending?

MR. PRICE: I think she just said she didn't recall.

MR. LAUB: I think she answered the question.

MS. VILLANUEVA: Okay. Let's do it then. We'll go off record.

(Short pause.)

(A discussion was held off the record.)

BY MS. VILLANUEVA:

Q So we're looking at Exhibit 2. After the April 14th, 2023 evaluation with Amber, did you speak with Patricia Hurley or anyone at the county?

MR. PRICE: Objection, asked and answered.

MS. VILLANUEVA: I asked about the 12th. This is after the 14th.

THE WITNESS: I don't recall.

BY MS. VILLANUEVA:

Q Okay. After the April 21st, 2023 meeting with Amber, did you speak with Patricia Hurley or anyone at the county?

A I don't recall.

Q After the May 12th in person meeting, May 12th, 2023 in person meeting with Amber, did you speak with Patricia Hurley or anyone at the county?

A I did.

Q Who did you speak with?

A I spoke to Patricia.
Q Okay. And what did you discuss?
A I told her we had concluded the evaluation and that I would be submitting a report.
Q Okay. And did you discuss your thoughts on the evaluation with her at that time?
A I did not.
Q Okay. Did you communicate with her whether you believed Amber to need some kind of medical retirement?
A I did not.
Q During your responses to the county's counsel, you mentioned that the county paid you to provide the evaluation of Amber; is that correct?
A That's correct.
Q Do you have a contract with the county to provide evaluations for some of its employees?
A I do not.
Q How often do you -- in a year, in a general year, on average how often do you provide county employees with evaluations?
A Probably a couple a year.
Q Okay. And so you've done work with county in the past -- or let me rephrase the question.
Prior to Amber, have you done work with the county -- excuse me. Prior to your work with Amber, has

the county hired you to perform evaluations on some of its employees?

A Yes.

Q Okay. How long have you been working with the county to provide evaluations?

A Five to ten years maybe. I would estimate five to ten years.

Q Is it your hope to continue working with the county?

A I don't have a hope either way.

Q That's it. That's all.

THE REPORTER: Mr. Price, do you want a copy?

MR. PRICE: Yes, please.

MR. LAUB: Not for me, thank you.

(The proceedings concluded at 3:05 p.m.)

# CERTIFICATE OF DEPONENT

PAGE LINE CHANGE

I, JANICE FUNG, deponent herein, do hereby certify and declare under penalty of perjury the within and foregoing transcription to be my deposition in said action; that I have read, corrected and do hereby affix my signature to said deposition.

______________________________

Janice Fung, Deponent

CERTIFICATE OF REPORTER

I, DIANNE M. BRUMLEY, Certified Court Reporter, State of Nevada, do hereby certify:

That I reported the deposition of Janice Fung commencing on Thursday, November 6, 2025, at 1:30 p.m.;

That prior to being deposed, the witness was duly sworn by me to testify to the truth; that I thereafter transcribed my said shorthand notes into typewriting and that the typewritten transcript is a complete, true and accurate transcription of my said shorthand notes; that prior to the conclusion of the proceedings, the reading and signing was not requested by the witness or a party;

I further certify that I am not a relative or employee of counsel of any of the parties involved in said action, nor a person financially interested in the action.

In witness whereof, I hereunto subscribe my name at Reno, Nevada, this 17th day of November, 2025.



DIANNE M. BRUMLEY, NEVADA CCR #205

CALIFORNIA CSR #6796