# EXHIBIT 11

EXHIBIT 11

**WASHOE COUNTY**
**OFFICE OF THE COUNTY MANAGER**

1001 E. 9th Street
Reno, Nevada 89512
Phone: (775) 328-2000
Fax: (775) 328-2491
www.washoecounty.gov

June 14, 2023

Amber Howell
c/o Kendra Jepson
6651 Diamond Wing Court
Sparks, NV 89436

**Delivered via Hand Delivered**

Re: Leave without Pay

Ms. Howell,

In accordance with Part II(B)(3)(c) of Washoe County's Policy on Complaints of Policy Violations Against Department Heads, Assistant County Managers and the County Manager, I have consulted with the Chair of the Board of County Commissioners, and based on the allegations that you committed gross misconduct, you are hereby being placed on **leave without pay (LWOP) effective Thursday, June 15, 2023**, pending the outcome of the investigation.

Sincerely,

Eric P. Brown
Washoe County Manager

SIMONS HALL JOHNSTON

| | |
|---|---|
| TO: | Patricia Hurley, Director of Human Resources |
| CC: | Mary Kandaras, Esq., Chief Deputy District Attorney; Chaz Lehman, Esq., Deputy District Attorney |
| FROM: | Sandra Ketner |
| DATE: | June 20, 2023 |
| RE: | Human Services Agency Investigation – Final Report |

## I. STATUS OF INVESTIGATION

On June 12, 2023, I submitted a Preliminary Report regarding my findings and conclusions to date in the independent investigation into allegations against Human Services Agency ("HSA") Director Amber Howell. Since then, I interviewed all Washoe County employees identified as witnesses by Howell and gathered documents that Howell identified and I determined were relevant to the investigation. None of the recently gathered information changed any of my prior findings and conclusions that Howell indeed violated Washoe County policies as set forth in the Preliminary Report. The entirety of my investigative findings and conclusions are stated below.

## II. WITNESSES IDENTIFIED AND INTERVIEWED

As stated in the Preliminary Report, I initially interviewed the following witnesses:

| | |
|---|---|
| May 4: | Ryan Gustafson, Division Director of Children's Services; Stephen McBride, Division Director of Children's Services; Abby Willrich, Senior Services Coordinator; Erich Willrich, Assistant to the County Manager; |
| May 5: | Cara Paoli, Director of Adult & Senior Services; Amy Reynolds, Children's Services Coordinator; Pamela Mann, HSA Director of Finance & Administration; |
| May 10: | Tammi Williamson, Children's Services Coordinator; Brandi Johnson, Fiscal Manager; |
| May 15: | Sheila Gerhart, Human Services Program Specialist; Shannon McCoy, Children's Services Coordinator; and |
| June 1: | Amber Howell, HSA Director. |

Thereafter, I interviewed the following witnesses identified by Howell:

June 15: Kim Schweickert, Our Place Coordinator; Heather Libretti, Human Program Specialist; Emily Smith, Adoption Supervisor; Josh Noble, Human Services Program Specialist; Tara Goodsell, Case Compliance Reviewer; and

June 16: Lisa Lee, Human Services Program Specialist who is currently serving as a supervisor for Crossroads program.

After interviewing the witnesses identified by Howell, I sought clarification and additional information from Gustafson, Paoli, and Mann on June 16, 2023. In light of the information gathered from all witnesses interviewed, I determined that interviewing additional employee witnesses (such as Cindy Hildenbrandt, Amy Sandvik, Dorothy Edwards and Diane Comeaux) would be superfluous and unnecessary.

Howell also identified Karis Sellman, a foster parent who is not employed by Washoe County, as a witness to "confirm that Baby Z was not placed with her based upon any favoritism from [Howell]." While Howell was alleged to have engaged in favoritism towards certain HSA clients and non-clients, the placement of Baby Z with the Sellmans was not part of those allegations. Rather, it appears from the information gathered during the investigation that Baby Z was initially placed with the Sellmans because they were fostering and planning to adopt his older sibling, Jade. Therefore, I determined that it was not necessary to interview Sellman as she was unlikely to provide any information directly relevant to the allegations. No other witnesses with directly relevant and personal knowledge were identified by Howell.

## III. RELEVANT DOCUMENTS IDENTIFIED

A substantial number of documents were gathered during the investigation and have been saved to a thumb drive which will be delivered to your office. Following Howell's interview, Howell's legal counsel provided a sample of text message communications and identified other documents regarding fundraisers. Howell's counsel confirmed that none of the text messages related to employees soliciting funds on behalf of their relatives. Additionally, Howell's counsel represented that Washoe County does not have a policy addressing fundraising and I did not locate any specific policies addressing fundraising in either the Washoe County Personnel Handbook or on the Washoe County website (https://www.washoecounty.gov/humanresources/Policies/policiesfulllisting.php).

While I obtained the majority of documents identified by Howell as being relevant to the investigation, some documents were either deemed irrelevant or unable to be located. For example, I did not obtain Howell's substance abuse evaluation completed by Janice Fung because Howell's fitness for duty was not part of my investigation and therefore, the document was not directly relevant. Likewise, I did not obtain emails between Howell and either Assistant County Manager Thomas or County Manager Brown regarding the Cashman Good Government dinner as Gustafson was unable to locate any such communications and other evidence gathered during the investigation refuted the allegations against Howell. Finally, I did not obtain Howell's email to the Crossroads staff regarding the disclosure of information to Alta Vista because neither Assistant

County Manager Thomas nor Gustafson were able to locate it. Otherwise, all documents identified by Howell were gathered and reviewed as part of the investigation.[1]

## IV. SUMMARY OF ADDITIONAL EVIDENCE

### A. Witnesses Identified By Howell

#### *1. Kim Schweickert*

Schweickert has worked for Washoe County for twenty-two years, worked for HSA for fifteen years and has been friends with Howell for about four years (since before the Our Place campus opened).[2] Schweickert denied that she ever personally experienced favoritism by Howell but acknowledged that she has gone directly to Howell because things got lost in translation when she went with requests to her former supervisor, McBride. Schweickert explained that Howell has been supportive of the Our Place campus because homelessness has been on the front page of every newspaper in recent years. However, Schweickert has also experienced frustration with Howell's denial of certain requests. According to Schweickert, Howell made it clear that it was not appropriate for them to discuss other program areas that did not involve Our Place. In light of Schweickert's remark, I presented her with Howell's email forwarding McBride's message about the Women's Crossroads graduation rates to her with the comment "Oh. My. God." and asked if it was appropriate for Howell to be sharing her division director's email with his subordinate. Schweickert stated that she had asked for the Crossroads graduation rates so she read the outcome information from McBride but did not read McBride's email or Howell's comment.

Schweickert represented that she has had to advocate for the funding received by Our Place. Schweickert stated that Amy Reynolds cried the loudest about Crossroads funding even though that program (which is similar to Our Place) has more staff per resident than Our Place. Schweickert noted that McBride was very involved in Crossroads but not involved in Our Place. Regarding Howell's decision to switch McBride's and Paoli's position, Schweickert understood that McBride had prior experience working with youth while Paoli had connections with funding. Since the switch, Paoli has not been very involved in the Our Place program but Schweickert noted that Our Place runs very well on its own.

Schweickert denied hearing Howell make any comments about loyalty but noted that Catrina Peters created a Microsoft Teams chat group referring to Howell as "the Queen" and to her and Peters as Howell's "bees." Schweickert also denied hearing Howell make derogatory remarks about Assistant County Manager Thomas. However, Schweickert acknowledged that she and Howell discussed "the flyer" that was distributed prior to the last election that mentioned Assistant County Manager Thomas when it was delivered to Schweickert's daughter's residence. Schweickert further acknowledged discussing frustrations concerning Assistant County Manager

---

[1] In her email identifying witnesses and documents, Howell's counsel included a section entitled "Other Comments" stating "Kate Thomas has informed Amber that she takes Xanax and that Lori Cooke 'pops' Xanax." However. Howell's counsel indicated that both employees have prescriptions for the medication. Moreover, there have not been any allegations that either Assistant County Manager Thomas or Cooke have solicited prescription medication from other employees. Therefore, I determined that neither Assistant County Manager Thomas's nor Cooke's prescription medication history was relevant to the investigation.

[2] Don Gill attended Schweickert's interview as her WCEA representative.

Thomas with Howell (such as the priority to fence the Soulful Seeds garden before the upper area of the Our Place campus). Schweickert denied ever witnessing Howell intoxicated at work or receiving any requests from Howell for prescription medication or bottles of wine in exchange for action on her part. Likewise, Schweickert denied receiving requests from Howell for gift cards or demands from Howell for donations to her children's fundraisers (although Schweickert noted that she has donated to those fundraisers without any pressure from Howell to do so). Schweickert represented that she has contributed to gift baskets for staff in the past but her participation was voluntary.

Schweickert represented that the Cashman Good Government awards dinner was held in Carson City in February or March of this year. Schweickert attended the event as well as Alisha Craft (Our Place supervisor) and Hilary Peterson (mental health clinician). Schweickert stated that others were supposed to attend but it snowed on the night of the event so some people "flaked" and Howell's parents attended in their place. Schweickert did not have any information regarding Howell's use of the agency's Aces tickets. Schweickert provided background information regarding some of the individuals who Howell appointed to positions within the agency (Darren Planck, Lisa Lee, Julio). Schweickert acknowledged having met Baby Z when Howell was providing respite services but denied that Howell was emotional about the infant. Schweickert stated that Howell has not mentioned the infant since Howell concluded the respite services.

Schweickert represented that Howell is passionate, works tirelessly for the people served by HSA and goes above and beyond because she cares about the families they serve. Schweickert was unable to speak to how Howell treats others but represented that she has not had any experiences with Howell like the ones alleged.

### *2. Heather Libretti*

Libretti acknowledged that she was appointed by Howell as a human services program specialist last year and has known Howell since her daughter's placement with her as a foster parent. Libretti explained that her daughter was born in 2016 and adopted in 2019. Over the course of that three year period that Libretti spent waiting to adopt her daughter, Howell periodically checked in with her. Libretti denied that she received any special treatment or favoritism from Howell. While Libretti acknowledged that she received payment for a portion of her attorney's fees, Libretti explained that she applied for the attorney's fees payment, which was an allowable expense by the agency, just like everyone else.

In August 2019, Libretti was working for the Hot August Nights Foundation and saw Howell at an event. Libretti told Howell that she wanted to do more with foster parents which lead to discussions about Libretti working for HSA and her eventual appointment by Howell. However, Libretti explained her background in marketing as well as her desire and focus on improving the experience of foster parents. Libretti described Howell as a friend but denied that they have ever gone to dinner together.

Libretti denied hearing Howell make threats, demands for loyalty, or derogatory comments about members of County management. Libretti also denied that Howell ever discussed personnel issues with her or made derogatory comments about employees. In light of Libretti's comment, I

presented Howell's text exchange with her, Johnson and Mann wherein Howell "rants" about blowing up the foster care unit. Libretti explained that the group had had many meetings about why the agency was losing foster parents. Libretti further explained that Howell is a very passionate person and was getting her feelings out so she could take a breather, sit down and reassess. Libretti noted that Howell texted the employees (her. Johnson and Mann) on their personal cell phones. Therefore, Libretti did not feel that the text from Howell was inappropriate. Libretti acknowledged that Howell had discussed certain groups (i.e., the foster parent unit, Women's Crossroads) not meeting expectations and why those groups were failing but denied that Howell specifically discussed the performance of the coordinators (Sandvik and Reynolds).

Libretti denied witnessing Howell make erratic or poor decisions. Libretti explained that Howell's empathy comes through and Howell wants to solve the problem as fast as she can but nothing is erratic or out of the box. Likewise, Libretti denied seeing Howell engage in favoritism as Libretti explained that Howell is passionate about all programs. Libretti believed that Howell's decision to switch McBride and Paoli was a good one and played to their strengths because McBride was previously over the Children's Division.

Libretti did not meet Baby Z but saw pictures of the infant that Howell sent to everyone. Libretti denied hearing Howell make comments that she wanted the agency to bypass its obligation to vet the infant's family members for placement. Libretti noted that even if Howell wanted that, it would not be possible because if a family member is deemed appropriate, the agency has no choice.

Libretti denied seeing Howell intoxicated at work or hearing Howell ask for prescription medication. She also denied hearing Howell make requests for bottles of Rombauer but noted that it sounded like a joke by Howell. Libretti represented that she has no involvement in the issuance of gift cards. Libretti denied that she was asked by Howell to purchase raffle tickets for her children's fundraisers but admitted that Howell asked her to complete surveys. Libretti represented that she completed the surveys by choice, not because she felt pressured to do so, and could not remember any offer by Howell for comp time. Libretti did not have any information regarding Howell's use of the agency's Aces tickets.

Libretti described Howell as passionate and empathetic and noted that everyone wants her job. Libretti has not heard anything more from Howell than what could be viewed as someone blowing off steam.

### *3. Emily Smith*

Smith denied hearing Howell make demands for loyalty or derogatory comments about employees or members of County management. Smith also denied witnessing Howell intoxicated at work or receiving requests from Howell for prescription medication or demands to participate in fundraisers. Likewise, Smith denied witnessing favoritism or retaliation by Howell. While Smith has been involved in the issuance of gift cards for post-adoptive families, she denied that Howell ever asked her to obtain and provide gift cards directly to Howell. While Howell occasionally asks Smith specific questions about adoption, Smith described Howell as "not a very visible director."

Smith was recently diagnosed with cancer and stated that there is nothing secretive about her condition. Smith explained that she has discussed her condition with Howell and other HSA employees.

### *4. Jessi Valencia*

Valencia described Howell as one of the most proactive individuals that she's had the pleasure to work with. According to Valencia, Howell is willing to listen to both sides of the story and advocates for what is right. Valencia was involved in Libretti's adoption case for a short period of time but not involved in the court process or decision making. Valencia denied that Libretti received any special treatment from Howell.

Valencia denied witnessing Howell engage in favoritism or retaliation towards employees. Valencia also denied hearing Howell gossip or make derogatory comments about HSA employees or members of County management. Valencia did not have any information about Howell's use of the agency's Aces tickets and did not have any direct conversations with Howell about gift cards (but was aware that the Waffles program allowed foster parents to obtain gift cards for kids). Valencia denied that Howell ever asked her for prescription medication or to participate in her children's fundraisers.

Valencia was confused by Howell's decision to switch Paoli and McBride but was unable to identify any other decisions that seemed strange to her. Valencia acknowledged that she does not know Howell on a personal level and their interaction has been strictly professional. Nevertheless, Valencia's experience with Howell has been very positive as Howell has been willing to listen to her issues and be proactive about them.

### *5. Josh Noble*

Noble previously worked with Howell at the State. While he described her as a "friend" because he's known her for so long, he has never "hung out" with her. Howell appointed Noble to his first position with HSA as well as his current position. Noble denied witnessing Howell engage in any favoritism towards clients or employees and stated that she is fair across the board.

Noble has not heard Howell make any demands for loyalty or derogatory comments about employees or members of County management. However, Noble acknowledged hearing Howell comment about her frustrations with the County Manager's office, which Noble noted can be demanding. Noble denied witnessing Howell engage in any retaliatory conduct and further denied knowing anything about Howell's relationship with Reynolds. Noble denied witnessing Howell engage in erratic decision making and noted that Howell tries to follow through if she says she's going to do something. Noble further stated that Howell's decision to switch Paoli and McBride was out of his purview.

Noble has not seen Howell intoxicated at work and she has not asked him for prescription medication. While Howell has asked him to obtain gift cards, he explained that the gift cards are purchased through the family engagement center. Noble has never suspected that Howell has used gift cards purchased by the agency for her own personal use. Noble had no information regarding

Howell's use of the agency's Aces tickets. Noble knew that Howell provided respite services but denied that Howell talked to him about the matter. Noble denied that Howell asked him to participate in her children's fundraisers or do her children's homework for them. However, Noble explained that he has helped her children with graphics and power point presentations just like he has helped other employees edit their photographs. Noble described Howell as "amazing" as she has a lot to handle and a lot to deal with.

### *6. Tara Goodsell*

Goodsell was involved in the Women's Crossroads audit which identified the need for policies, documentation and programming. Goodsell did not recall any findings of fraud or improprieties involving Medicaid invoicing but noted that she was not involved in the fiscal audit. Goodsell did not know why the Alta Vista contract was terminated. Goodsell represented that she does not have a ton of contact with Howell. Although she described Howell as very supportive, she explained that her unit is pretty divided from the rest of the agency.

Goodsell denied hearing Howell make any comments regarding loyalty or derogatory comments about employees or members of the County Manager's office. Goodsell also denied witnessing Howell engage in favoritism or retaliation. Goodsell was aware that the agency's division directors were appointed by Howell but noted that it seemed to be working. Goodsell was surprised by Howell's decision to switch Paoli and McBride but assumed that it was based on a need for structure. Goodsell noted that everyone has opinions and there are always rumblings about something.

Goodsell has never seen Howell intoxicated at work and has never been asked by Howell for prescription medication. Howell has never asked Goodsell for money, gifts or gift cards, or to contribute to her children's fundraisers. Goodsell heard that Howell provided respite services but denied having any conversations with Howell about the matter. Goodsell believed that the agency issued a license to Howell to provide respite services and nothing came up out of the ordinary. Goodsell understood that the Waffles program was created because the agency had money to provide to foster parents. Howell had conducted interviews with foster parents who expressed a need for support. Goodsell heard that the Waffles program is currently out of money but she was not positive about that statement.

### *7. Lisa Lee*

Lee led the audit team and wrote the Women's Crossroads audit report.[3] Lee stated that Alta Vista did "great" in the audit but HSA "did not do good." More specifically, Alta Vista had its documentation in order but needed to do better in terms of conducting background checks and certifications for its staff as well as ensuring that the medication box utilized a two key approach. Meanwhile, HSA had no documentation, no case plans and no case notes. When asked if the audit revealed fraud or potential fraud, Lee stated that she did not conduct the financial audit so she did not know anything about fraud. When asked if the audit revealed that HSA was signing off on Medicaid billing without checking that the services were actually provided, Lee stated that she never heard of that allegation.

[3] Michael Touhey attended Lee's interview as her WCEA representative.

Lee stated that McBride was upset with her for sending the audit report to him, Howell and Reynolds. McBride wanted Lee to send the report to him and Reynolds only. However, Lee wanted everything to be transparent and ensure everyone had access to the same information so she sent the report to Howell as well. Lee reported that McBride took a punitive approach to the audit results and that McBride and Reynolds completely cut off her team that was trying to provide technical assistance to the Crossroads program. Reynolds eventually asked Lee if she could reach out to her for assistance (apparently because McBride told Reynolds not to reach out to Lee and to figure it out on her won) and Lee told Reynolds that she could do so.

Lee reported that Alta Vista ended the contract, not HSA. According to Lee, HSA then had to emergency parachute a new vendor (RISE) into the Crossroads program as a result of Alta Vista's termination of the contract. After Alta Vista pulled out, Lee attempted to arrange HSA staff training with Reynolds but Reynolds reported that she did not have time for the training.

Lee expressed frustration with McBride not knowing the programs that he oversaw and relying upon his background as "a juvenile justice guy." Lee believe that Howell's decision to switch Paoli and McBride was refreshing and positive. Lee explained that Paoli has been "super involved" and learning all she can and has really benefits the Crossroads programs since transferring to Adult and Senior Services. Lee thought that Reynolds' decision to transfer to the Children's Division after McBride's transfer was announced was "weird." Since Reynolds' transfer, Lee has been helping out with Crossroads. Lee stated that so much has been given to Crossroads but the multi-disciplinary team does not know their roles and lacks the tools to achieve its goals and objectives of the program. Lee further stated that in comparison to the Our Place program, Women's Crossroads' staff has very low caseloads.

Lee denied witnessing any favoritism by Howell towards employees or programs. Lee stated that Howell protected the employes from "the dirt and grime" but the agency is awful in her absence. Lee explained that everyone seems stressed out and guarded and there are cliques amongst employee groups. Lee reported that she and others were recently forced to move their office spaces but Lee was unable to articulate a reason for the move. Lee did not have any additional information relevant to the allegations.

## B. <u>Additional Details from Howell's Interview</u>

A description of Howell's statements and responses to the specific allegations was provided in the Preliminary Report. However, Howell's explanation of why she believes the allegations have been lodged against her was not included in the Preliminary Report and therefore, is summarized below.

Howell contends that the allegations against her arise from employees who are disgruntled for various reasons. For example, Howell stated that Reynolds is "very angry" with her and that Paoli and McBride are "mad" because they did not want to move positions. While Howell was not certain why Mann made allegations against her, Howell suspects that Mann might see Howell's actions as unethical or outside the lines. However, Howell stated that if so, it was Mann's job to give Howell a policy to follow (presumably in reference to the gift card issue). Howell believes

that Johnson lodged allegations against her in an effort to avoid getting caught having secondary employment through WellCare (which Howell claims was a conflict of interest).

Additionally, Howell contends that Assistant County Manager Thomas has been trying to get rid of her from Day 1 and is now on a witch hunt. Howell reported that Assistant County Manager Thomas is meeting with HSA employees at Coffeebar and doing her own investigation to build a case against Howell. Howell's legal counsel added that all of the allegations against Howell stem from the restraining order issue involving Assistant County Manager Thomas and Commissioner Mike Clark. Howell's legal counsel explained that Howell is receiving backlash because she is viewed as being "backed" by Clark.[4]

Howell stated that if she is guilty of anything it is of helping people more than she should and trusting a team (some of whom she has known for two decades) to be able to joke around, care about kids but have a little bit of humor. Howell reported feeling sad that the team felt uncomfortable. While Howell believes that the employees are in "self-preservation mode" and trying to "pile it on" to terminate her, she also believes that there is a logical explanation for all of it. Howell reported that she has had the weight of Washoe County on her shoulders for 8 years and is horrified about what people said about her. However, Howell noted that she is in trauma therapy and has a lot of work to do on herself.

### C. <u>Additional Information from Gustafson, Paoli and Mann</u>

Gustafson, Paoli and Mann denied that Assistant County Manager Thomas has been on a witch hunt or conducting her own investigation about Howell since the initiation of the independent investigation which is the subject of this report. Mann explained that she first approached Assistant County Manager Thomas about her concerns regarding Howell's conduct and behavior. Mann further explained that the other division directors eventually agreed to speak with Assistant County Manager Thomas and human resources about their collective concerns, which resulted in the initiation of this investigation.

Likewise, Assistant County Manager Thomas denied meeting separately with the employees about Howell or investigating their allegations against Howell after the initiation of this investigation. Assistant County Manager Thomas acknowledged having a meeting with you and the division directors which resulted in the initiation of this investigation. Since then, Assistant County Manager Thomas has received only a verbal status update regarding the investigation or has had limited meetings with the division directors to discuss business and daily work items.

---

[4] The only allegation involving Howell's relationship with Clark was raised by Abby Willrich. Specifically, Abby reported that at the end of March, Howell told her that Commissioner Clark was planning to go after Abby's soon-to-be ex-husband (Erick Willrich) and expose him for what he has done in a published article (presumably in relation to Erick's infidelity). Abby produced a text exchange with Howell wherein Abby asked Howell to give her "a heads up if an article does come out" and Howell replied, "Don't worry it will be focused on him and it may never happen so don't stress."

### *1. Ryan Gustafson*

Gustafson did not believe that Dorothy Edwards had a personal connection with Arisa Tongco (the youth group coordinator referenced in the fundraiser announcement produced by Howell). In contrast, Gustafson stated that Howell told the staff, "you will do 150 surveys" and then called and texted constantly about the staff's progress. Gustafson confirmed that Howell had use of a County vehicle about four years ago and that Howell could have signed cars out from the Center Street parking lot.

Gustafson confirmed that Howell's decision to switch Paoli and McBride was due in part to their poor performance. Gustafson explained that Howell felt McBride was doing a horrible job and Paoli was doing a poorish (C-) job. Gustafson stated that Howell did not have the courage to deal with the performance deficiencies of McBride and Paoli so she decided to switch them under the guise of wanting "fresh eyes" on the programs. However, Gustafson also reported that Howell wanted to get Reynolds out of the Women's Crossroads program but could not move Reynolds due to her grievance against Howell. Gustafson explained that Reynolds and Schweickert did not like each other, Reynolds complained that the Women's Crossroads program was neglected in favor of Our Place, and Howell did not want Reynolds to oversee a program by herself. Therefore, Howell's decision to move McBride was also based on knowing that Reynolds would follow him.

Regarding Howell's announcement that Reynolds would split duties with McCoy, Gustafson explained that Howell texted him and Paoli in the middle of the coordinators meeting saying that she was going to talk about the move. Paoli knew that McCoy was unaware of the decision so she asked Howell not to do so but Howell proceeded anyway. Therefore, Gustafson refuted Howell's statement that she did not know that McCoy was unaware of the decision to split her duties with Reynolds.

Regarding Howell's alleged statements concerning the placement of Baby Z with someone other than his out-of-state grandmother, Gustafson confirmed that Howell did not explicitly say in a recorded meeting with him, Mann, McBride and McCoy "find a reason not to place the baby with grandma."[5] However, Gustafson stated that he had many conversations with Howell wherein she stated her dislike for how many chances biological parents have to get their children back. Gustafson also stated that he had several conversations with Howell and Williamson wherein Howell explicitly stated that they had to find a way to terminate Baby Z's parental rights and not

---

[5] A recording of the meeting confirms that Howell made the following statements while sobbing and pausing between comments: "You guys have no idea. My boss is a just a stupid bitch"; "grandmas has never met him, ever ever"; "I'm kind of speechless because I love this baby so much. So could we do a home study on Jamie Hanlon at the same time as the grandma"; "Grandma cannot take care of this baby. I had him for eleven days and like, I just have a lot of emotions around it"; "I need this baby to go somewhere amazing. Like I'll die"' "I'm really attached to him. I want what's best for him and I'm really upset. I want him to go somewhere amazing, like I'm really upset"; "I'll get in trouble but, but I need him to have a home, a good home. My heart is broken"; "I'm upset. I love this baby so much"; "I'm so attached to him"; and "we need to do right by this baby however we can." Even though Howell did not explicitly instruct McCoy to find a reason not to place Baby Z with his biological grandmother, it is clear from Howell's statements that was indeed her intention and point of having the discussion. It is also clear that McCoy understood Howell's intentions to find another placement for Baby Z (such as the Hanlons who reside locally) because at the conclusion of the meeting, McCoy stated that although she had been silent, she "gets it" and will try to convince the grandmother that there is another suitable home. McCoy also acknowledged that if the matter went to court, the agency probably would not win the dispute if the grandmother was deemed suitable.

place the baby with his biological grandmother because she resides out of state. Gustafson provided additional text exchanges with Howell wherein she made statements such as "I'm obsessing" (in reference to contacting the District Attorney's office regarding the termination of Jade's parental rights), "I'm sick of him" (in reference to a mug shot and charge count of Jade's biological father), "These parents are awful and I don't believe in reunification very often. I think a child's clock is more important than a parents rights," "I need him" (in reference to Baby Z), "I'm watching him again the end of April. I can't detach. I'm in morning" (in reference to Baby Z) and "He is a love. I am so attached to him. It's bad" (in reference to Baby Z).

### *2. Cara Paoli*

Paoli obtained information from Sandvik regarding Howell's requirements to provide respite services. Sandvik reported that a respite provider is not required to be licensed per the Normalcy Policy if the respite provider knows the foster parents and the foster parents are using their network for babysitting. However, Sandvik noted that HSA would not provide the respite provider with clothing and baby supplies (like Howell obtained) because that would be the responsibility of the foster parents. Sandvik also referenced the State of Nevada, Division of Child and Family Services'(DCFS) respite policy and indicated that eleven days of respite without approval is not common. Sandvik reported that HSA's licensing and placements teams were not aware that Howell was providing respite services in her home until Howell already had the baby for a few days and that Howell criticized Sandvik's team as being "ineffective" because the team did not call to check on Howell (to which Sandvik explained that it was the foster parents' responsibility to notify her team of the arrangement because otherwise the team expected the infant to be with the foster parents).

Paoli provided a grid setting forth DCFS' respite requirements that include a home inspection and background checks. The only exception to the background check requirements are if the respite services are provided infrequently and for a short amount of time "(e.g. date night; med appt, shopping)" and the children are directly supervised and cared for at all times only by the individual respite provider. Paoli noted that "normalcy" is intended to allow foster kids to sleepover a friend's house without the friend's parents having to undergo a background check. In other words, "normalcy" is in the eyes of the child in an effort to make the child feel normal.

Paoli also obtained information from Natalie Miller, Children's Services Supervisor, who reported that the foster family had notified her unit that they were going on a trip and Howell would provide respite services to baby Z during their absence. Miller asked the case worker if other relatives could provide the respite rather than Howell but Miller was unaware of the results of that request. During the time that Howell provided the respite services, she was in contact with Miller about various issues (over the counter medication and family engagement center appointments). Miller believed that Howell was licensed as a foster home.

### *3. Pamela Mann*

Mann reported that the decision to terminate the contractual relationship between HSA and Alta Vista was somewhat mutual. Mann explained that Alta Vista wanted to do only a portion of the

work it was contracted for and HSA would not allow Alta Vista to modify the scope of the work. Therefore, Alta Vista provided its 30-day notice to terminate the contract on August 22, 2022.

Mann stated that there was a lot of discussion around the Women's Crossroads audit but there was no evidence of fraud. According to Mann, Howell could have told the staff that they decided to part ways amicably with Alta Vista but Howell took it a step further and mentioned fraud.

Mann reported that Howell's decision to switch Paoli and McBride was based in part on her desire to move Reynolds out of the Women's Crossroads program. Mann explained that Howell unequivocally stated that she wanted to fire Reynolds. Mann told Howell that she could not fire Reynolds because there was no performance documentation in Reynolds' file. Thereafter, Howell made the "fraud" comment in the Women's Crossroads staff meeting, Reynolds filed a grievance against Howell, and Howell was prohibited from making any personnel actions involving Reynolds. Mann acknowledged that she and Howell had discussions about Paoli's and McBride's performance and also discussed where they might be better suited. However, Mann advised and expected Howell to discuss the performance issues with Paoli and McBride. Instead, Howell skirted the issue and decided to switch them without addressing the performance issues.

Mann reported that Gustafson asked her to turn off his P-card in March because Howell was pressuring him to purchase an iPad for an unknown girl's birthday. According to Mann, Gustafson tried to get sufficient information from Howell but she did not provide it to him. Gustafson stalled for a while but then asked Mann to turn off his P-card to avoid any further pressure from Howell. In a Teams chat, Mann told the other division directors that she was turning off Gustafson's P-Card and the others decided that they wanted theirs' turned off as well in order to avoid Howell turning to them to purchase items.

Mann stated that Howell's response to the production of her text messages about wine and other items (i.e., she was just joking and believed that the employees were her family) is a convenient excuse after the fact for her histrionics. Mann reiterated her belief that Howell was not joking in those text messages and instead expected the staff to meet her demands or suffer the consequences. Mann reported that employees feel like they can breathe again since Howell has been on leave.

## V. FINDINGS AND CONCLUSIONS

Based upon the reports of HSA staff members, Howell is alleged to have engaged in acts and/or conduct that violate the following Washoe County policies:

- Washoe County Code of Conduct requiring honesty, respect, fairness and courtesy;
- Washoe County Core Competencies for All Employees regarding personal relationships, teamwork, and ethics and integrity;
- Washoe County Additional Core Competencies for Supervisors, Managers and Above regarding decision making, financial and resource management, and leading and inspiring others; and
- Washoe County Personnel Handbook, Section 5.337.

**1. Statements to subordinates regarding loyalty that were bullying and threatening**

My preliminary finding that Howell violated Washoe County policies by making statements to subordinates regarding loyalty that were bullying and threatening is unchanged. The additional evidence gathered during the investigation corroborated Howell's representation that she was referred to as "the Queen bee." Moreover, the additional witnesses interviewed denied ever hearing Howell make demands for loyalty or threaten the consequences of being disloyal. However, the denials of the recently interviewed witnesses do not discount the corroborated reports of Gustafson, McBride, Paoli, Mann, Reynolds and Johnson that Howell indeed made such comments. Thus, the preponderance of the evidence demonstrates that Howell violated the Code of Conduct requiring respect and courtesy, the Core Competencies for All Employees regarding personal relationships and teamwork, and the Core Competencies for Supervisors regarding leadership and inspiring others.

**2. Inappropriate and derogatory comments regarding members of County management**

My preliminary finding that Howell violated Washoe County policies by making inappropriate and derogatory comments regarding members of County management is unchanged. The additional witnesses interviewed denied ever hearing Howell make any derogatory comments about members of County management. However, the denials of the recently interviewed witnesses do not discount the corroborated reports of Gustafson, McBride, and Johnson that Howell indeed made such comments. Moreover, the recorded of the meeting between Howell, Gustafson, Mann, McBride and McCoy discussing Baby Z unequivocally confirms that Howell told her subordinates "my boss is just a stupid bitch." Thus, the totality of the evidence demonstrates that Howell violated the Code of Conduct requiring respect and courtesy.

**3. Inaccurate or untruthful statements**

Neither Howell's email to the Women's Crossroads' staff "correcting" the information she shared in the staff meeting about the end of Alta Vista's contract nor Howell's letter to Alta Vista's CEO have been located. While none of the witnesses involved in the Crossroads audit nor the audit document itself indicates any suggestion of fraud, the evidence reflects that Howell indeed brought up the issue of fraud. However, the exact context of Howell's statement remains unclear. Therefore, the allegation that Howell violated Washoe County policies by making inaccurate or untruthful statements is unsubstantiated.

**4. Derogatory comments and gossiping about employees**

My preliminary finding that Howell violated Washoe County policies by making derogatory comments and gossiping about employees remains unchanged. Smith did corroborate Howell's representation that she was open about her cancer diagnosis. Moreover, Schweickert reported that she did not read either Howell's or McBride's emails and simply looked at the outcomes reported by McBride. Nevertheless, other witnesses' reports as well as Howell's text communications confirm that Howell has made derogatory comments and engaged in gossiping about employees.

Indeed, Howell's comments about Smith in her text communications are unacceptable. Thus, the preponderance of the evidence demonstrates that Howell violated the Code of Conduct requiring respect and courtesy as well as the Core Competencies for All Employees regarding personal relationships.

**5. Favoritism towards employees and clients**

The witnesses recently interviewed (Schweickert, Libretti, Noble) provided additional information regarding their qualifications as well as the qualifications as others which support Howell's denials of favoritism towards employees. Likewise, other witnesses (Schweickert, Lee) provided information supporting Howell's denials of favoritism towards certain programs. Finally, Libretti provided information supporting Howell's denials of favoritism towards clients. Thus, this allegation of favoritism by Howell towards employees and clients is unsubstantiated.

**6. Retaliation towards employees**

The additional information gathered during the investigation further supports the finding that Howell decided to switch Paoli and McBride in part to satisfy her desire to move Reynolds out of the Women's Crossroads program. However, Howell's underlying rationale for wanting Reynolds out of that program remains unclear. Moreover, while Howell may have taken steps to make it more attractive for Reynolds to move out of coordinator position supporting the Women's Crossroads program, Reynolds' transfer to the Children's Division was clearly voluntary. Thus, the totality of the evidence reflects that the allegation of Howell engaging in retaliation towards Reynolds is unsubstantiated.

**7. Erratic and poor decision making regarding programs and personnel**

My preliminary finding that Howell violated Washoe County policies by switching Paoli and McBride remains unchanged. Additional witnesses (Schweickert, Lee) reported experiencing difficulties with McBride's management of the division. However, other Gustafson and Mann confirmed that Howell decided to switch McBride and Paoli without addressing their performance issues. Moreover, Howell's representation that McBride and Paoli could have declined the transfer does not seem credible in light of her explanation that the current allegations asserted against her arise from Paoli's and McBride's dissatisfaction with their transfer.

Howell's right to transfer division directors who serve at the will of the agency Director is clear. However, the preponderance of the evidence reflects that the manner in which Howell executed the switch violated the Code of Conduct requiring honesty, the Core Competencies for All Employees regarding communication and personal relationships, and the Core Competencies for Supervisors regarding decision making.

The remaining allegations against Howell regarding her decision making are unsubstantiated.

**8. <u>Disregard for HSA objectives regarding the reunification of an infant with a relative in favor of her own personal interests</u>**

My preliminary finding that Howell violated Washoe County policies by disregarding the agency's objectives in favor of her own personal interests remains unchanged. In fact, the additional evidence gathered during the investigation further supports the conclusion that Howell put her own personal interests ahead of the agency's objectives and used her position to avoid the respite requirements. Howell made multiple comments regarding her attachment to Baby Z and her desire for the infant to find "a good home," which clearly did not include the home of his biological grandmother who Howell made disapproving statements about (i.e., grandma has never ever met him, grandma cannot take care of him). Howell also made comments supporting the termination of Jade's parents' rights. Such statements regarding Baby Z and Jade were not in line with the agency's directives or consistent with legal standards. Thus, the totality of the evidence reflects that Howell violated the Core Competencies for All Employees regarding teamwork and ethics and integrity, the Core Competencies for Supervisors regarding decision making, and Personnel Handbook, Section 5.337.

**9. <u>Disregard for HSA protocol and procedures regarding the purchase and distribution of gift cards and other items (clothing, groceries, etc.) to clients and members of the public</u>**

My preliminary finding that Howell violated Washoe County policies by disregarding the agency's protocols and procedure for the issuance of gift cards and other items remains unchanged. As previously stated, the evidence that Howell repeatedly asked for gift cards and other items without providing sufficiently identifying information is substantial. Howell's contention that it was Mann's responsibility to put protocols and policies in place for her to follow is completely disingenuous as email communications reflect that Howell fought against the implementation of such policies. For example, in February 2023, Johnson distributed a form to the division directors and Howell to be used for adult and nonclient assistance requests. Howell replied, "Do I have to use this?" Johnson responded, "Please?" to which Howell replied, "That's dumb." While Howell later stated that she was kidding, her intentions are doubtful in light of her other actions.

Additionally, Mann specifically created a "script" for Howell to use when approached by others for assistance. In the script, Howell is only expected to ask the individual for their name and number and explain that someone else from the agency will get back to them. It appears that there was further discussion amongst Howell and Mann on the topic because Mann subsequently emailed Howell explaining that the need for the policy arose because lower level staff feels uncomfortable pressuring someone in a leadership position to comply with paperwork processes and an imbalance of power is created when leadership does not conform to the rules. Even while these discussions were occurring, Howell continued to pressure Gustafson for an iPad, which ultimately resulted in the division directors agreeing to turn off their P-cards to avoid the pressure from Howell. Thus, the preponderance of the evidence reflects that Howell violated the Code of Conduct requiring honesty, the Core Competencies for All Employees regarding ethics and integrity, and the Core Competencies for Supervisors regarding financial and resource management.

**10. Personally accepted and failed to share or fairly distribute valuable items that were paid for by the County (Aces championship ring, Aces tickets, award dinner)**

Schweickert corroborated Howell's representations that other employees were invited or expected to attend the Cashman Good Government awards dinner but did not attend the event due to the weather. Schweickert further confirmed that Howell's parents attended the event because others cancelled. None of the witnesses provided any additional information regarding Howell's use of the agency's Aces tickets. Based upon the preponderance of the evidence, this allegation that Howell personally accepted and failed to share or fairly distribute valuable items paid for by the County is unsubstantiated.

**11. Disregarded directive from Risk Management Department regarding children in the workplace**

No additional information was gathered regarding this allegation. Therefore, based upon the totality of the evidence, this allegation that Howell disregarded a directive from Risk Management regarding children in the workplace is unsubstantiated.

**12. Requests to employees for prescription medications**

My preliminary finding that Howell violated Washoe County policies by requesting prescription medication from employees remains unchanged. While none of the recently interviewed witnesses reported receiving any such requests from Howell, multiple other witnesses reported that Howell pressured them for prescription narcotics. Moreover, Williamson and Johnson admitted to providing Howell with such prescription medication. Howell's attempt to divert attention to the conduct of others (Assistant County Manager Thomas and Cooke) is futile as there are no allegations that they sought prescription medication from others. Moreover, Howell's legal counsel stated that the other employes have valid prescriptions for their use of the medication. Thus, the preponderance of the evidence demonstrates that Howell violated the Code of Conduct requiring honesty as well as the Core Competencies for All Employees regarding ethics and integrity.

**13. Activities that are inconsistent or in conflict with duties such as operating a County vehicle for her personal use and benefit, using County funds to obtain benefits for her personal use, requiring employees to contribute to fundraisers in which she had a personal interest, asking and/or requiring employees to provide her with gifts in exchange for her approval of vacation requests, payouts, and hiring decisions**

My preliminary finding that Howell violated Washoe County policies by engaging in activities that are inconsistent or in conflict with her duties remains unchanged. As previously stated in the Preliminary Report, there is substantial evidence proving that Howell asked and expected employees to provide her with gifts (Rombauer wine, Louis Vuitton wallet) in exchange for action on her part as agency Director. There is also unequivocal evidence that Howell expected employees to complete surveys for her son's baseball team and offered some employes comp time

for completing the surveys. Thus, the totality of the evidence reflects that Howell violated the Code of Conduct requiring respect and courtesy, the Core Competencies for All Employees regarding ethics and integrity, and the Core Competencies for Supervisors regarding leading and inspiring others.

The remaining allegations against Howell regarding her use of a County vehicle are unsubstantiated.

## VI. CONCLUSION

This report concludes the investigation into the multiple, wide-ranging allegations against Howell. As set forth above as well as in the Preliminary Report, the majority of the allegations were easily substantiated and clearly demonstrate that Howell violated Washoe County policies in that regard. While some allegations were not supported by the facts gathered during the investigation, there was no evidence to support Howell's contention that Assistant County Manager Thomas initiated a witch hunt against Howell. Rather, the division directors who initially reported their experiences with Howell appeared genuine and credible in their reporting. Moreover, other witnesses such as Johnson and Williamson who were clearly reluctant to participate in the investigation, nevertheless provided information that confirmed Howell's misconduct.

As noted above, we will deliver a thumb drive of the documents reviewed as part of the investigation. Please feel free to contact me if you have any questions regarding the evidence or findings or conclusions of this investigation.