**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

AMBER HOWELL,

Plaintiff

v.

WASHOE COUNTY,

Defendant

Case No.: 3:24-cv-00280-CSD

**Order**

Re: ECF Nos. 105, 107

Plaintiff Amber Howell ("Plaintiff") brought this complaint against her former employer, Washoe County, asserting claims under 42 U.S.C. § 1981a and § 1988, the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12112, 12132, 12203, the Rehabilitation Act, 29 U.S.C. § 794, and state law. (ECF No. 40 at 3.)

Before the court is Defendant's motion for summary judgment (ECF No. 105.) Plaintiff has filed a cross-motion for partial summary judgment. (ECF No. 107.) Responses (ECF Nos. 117, 129) and replies (ECF Nos. 128, 131) have been filed.

For the reasons that follow, the court will grant in part and deny in part Defendants' motion for summary judgment and deny Plaintiff's motion for partial summary judgment in its entirety.

## I. PRELIMINARY OBJECTIONS

In her response to Defendant's motion for summary judgment, Plaintiff asks the court to strike Defendant's Exhibit 9, arguing that it was not disclosed before the close of discovery. (ECF No. 129). Defendant disputes this, asserting it was timely disclosed and that, even if it had not been, the exhibit is a public meeting that can be judicially noticed.

Discovery in this action closed on November 26, 2025. (ECF No. 102.) Defendant has filed with the court a copy of its first supplemental disclosures, dated January 27, 2025, in which it indicated it was disclosing "Video Recording of April 5, 2023 Meeting," Bates-Stamped WC 2923. (ECF No. 131-1 at 5.) Plaintiff has not disputed the authenticity of this filing or, in response to it, continued to argue that the video was not, in fact, timely produced. Accordingly, Plaintiff's request that Defendant's Exhibit 9 be stricken is **DENIED**.

## II. FACTS

The following relevant facts are not in dispute.[1]

Plaintiff was the director of Washoe County's Human Services Agency ("HSA") from June 2015 until July 2023, when she submitted her resignation following an investigation and recommendation by the County Manager that she be terminated. (ECF No. 105-5 at 27-28; ECF No. 105-26; ECF No. 117-1 at 6.) The HSA comprises four divisions, each of which has its own director who reports directly to the HSA director. (ECF No. 105-5 at 2.)

Before 2023, there had largely been no official complaints about Plaintiff's job performance, Plaintiff had not received any written notice of deficiencies about her performance, and Plaintiff was meeting or exceeding in all areas at her last evaluation. (ECF Nos. 107-8, 107-9, 107-12.) But in late March 2023, one of the division directors reported concerns about Plaintiff's recent conduct to Kate Thomas, Plaintiff's supervisor. (ECF No. 105-5 at 2.) The division director's concerns revolved around Plaintiff's erratic and odd behavior, inability to stay focused, slurred speech, and failure to follow agency protocols. (ECF No. 105-8 at 6-8, 14-15.)

[1] Defendants argue, correctly, that an opposing party does not have to affirmatively agree to or concede its proffered facts for those facts to be undisputed. It is enough if the party passively fails to contest the facts.

Then, on April 5, 2023, Plaintiff attended a county meeting via Zoom, during which she exhibited behavior that included frequently touching and playing with her hair, mouth and teeth, frequently turning the video camera on and off, and pulling her sweater partially over her face. She also appeared to be speaking to someone off-camera. (*See id.*; ECF No. 105-10; ECF No. 106.)

After this meeting, two HSA employees alerted Thomas, who viewed the video and became concerned that Plaintiff may have an alcohol or substance abuse problem. (ECF No. 105-5 at 2-3.) Thomas spoke with Patricia Hurley, the human resources director, who decided Plaintiff should undergo a substance abuse evaluation to "determine whether she had a drug or alcohol problem and was fit to perform her job duties." (*Id.* at 3.) According to Hurley, this is Defendant's custom and practice anytime an employee is suspected of being under the influence while on the job. (ECF No. 117-8 at 2.)

On April 11, 2023, Plaintiff was informed that she was being placed on paid administrative leave and would be required to undergo a substance abuse evaluation. (ECF No. 105-5 at 3). Between April 12, 2023, and May 12, 2023, Plaintiff met with Janice Fung, a licensed alcohol and drug counselor, four times to complete the evaluation. (ECF No. 105-13 at 7-8, 11, 23). Fung also recommended that Plaintiff take a drug test, which Plaintiff did on April 13, 2023. (ECF No. 105-13 at 17-18; ECF No. 105-4 at 16.) The results were negative. (ECF No. 105-14 at 4.)

On April 20, 2023, the four HSA division directors met with Thomas to express concerns about what they perceived as a change in Plaintiff's behavior going back several months; the division directors say they requested the meeting, not Thomas. (ECF No. 105-5 at 3-4; ECF No. 105-8 at 9-12; ECF No. 105-16 at 6-8; ECF No. 105-17 at 9-19; ECF No. 105-18 at 8-9.)

At the meeting, the directors repeated many of the concerns already raised and added more, including but not limited to: Plaintiff's work-related decision-making, her intimidation of employees to participate in fundraisers for her children or to buy gifts for families and colleagues, her favoritism toward employees and clients, her disregard of agency policy regarding reunification of an infant with their grandmother, and her requests for medication from other employees.[2] (ECF No. 105-17 at 9-19; ECF No. 105-8 at 9-12.) Thomas then became concerned that Plaintiff had engaged in serious misconduct. (ECF No. 105-5 at 4.)

On April 26, 2023, Defendant hired a third party to conduct an independent investigation into whether Plaintiff had engaged in misconduct in violation of County policy. (ECF No. 105-4 at 31; ECF No. 105-19 at 2.)

On May 3, 2023, Plaintiff began treatment with Dr. Frank Lemus, who diagnosed her with "Adjustment Disorder with Mixed Anxiety and Depressed Mood." (ECF No. 108-3 at 2.) Dr. Lemus' notes also frequently mention Post Traumatic Stress Disorder (PTSD).

On April 30, 2023, Plaintiff checked herself into Reno Behavioral Health. (ECF No. 108-1.) There, she received a provisional diagnosis of major depressive disorder, with "functional impairments" that included "symptoms of depression, alcohol abuse, and maladaptive coping skills." (*Id.* at 27.) After a psychiatric evaluation on May 9, 2023, Plaintiff was diagnosed with major depressive disorder, severe, without psychosis, and a secondary diagnosis of PTSD and unspecified anxiety disorder. (*Id.* at 30-31.)

---

[2] As summarized by Hurley, the allegations included "[b]ullying, threatening behavior, favoritism, misuse of County property, and then protocols related to HSA, . . . asking for drugs, like asking people for their prescription drugs, . . . there was something related to a baby and [Plaintiff] not wanting to reunify it correctly . . . with a possible grandparent, . . . there were pretty outrageous favors for wanting time off." (ECF No. 105-4 at 32.)

After the final substance abuse evaluation meeting on May 12, 2023, Fung advised Hurley that the evaluation was complete, and she would be submitting a report. She did not discuss her thoughts on the evaluation at that time. (ECF No. 105-13 at 23-24).

On May 30, 2023, Fung submitted the final evaluation to Hurley, concluding that Plaintiff did not meet the criteria for a substance use disorder. (ECF No. 105-4 at 31; ECF No. 105-14 at 4.) The evaluation noted that Plaintiff had been having sleep issues for the past five years and had experienced trauma. (ECF No. 105-14 at 3.) It then stated: "It appears that Amber [Plaintiff] is experiencing professional and personal stress and may be at risk for developing a substance use disorder" before recommending weekly counseling, random alcohol and drug testing, a requirement that Plaintiff work from the office and be physically present for meetings, and increased frequency of supervision. (*Id*. at 4-5.) Fung testified at her deposition that this was "not a diagnosis" and was, instead, a reflection of Plaintiff's self-report of trauma and stressors.[3] (ECF No. 105-13 at 14.)

On June 12, 2023, Defendant received the preliminary report of the independent investigation, in which the investigator found several of the allegations against Plaintiff to be substantiated. (ECF Nos. 105-20.) On June 14, 2023, based on this report, the County Manager, Eric Brown, made the decision to place Plaintiff on leave without pay. (ECF No. 105-23; ECF No. 105-15 at 4.)

Defendant received the final investigation report on June 20, 2023. (ECF No. 105-21.) Ultimately, the report concluded that some allegations against Plaintiff were founded while others were not. Among those allegations deemed well-founded were that Plaintiff: (1) made

[3] Although Plaintiff asserts that Fung is licensed to diagnose mental health disorders, (*see* ECF No. 107 at 11), Fung testified she can only diagnose substance abuse disorders and does not diagnose mental health disorders. (ECF No. 105-13 at 14-15, 18-19, 21.)

statements to subordinates regarding loyalty that were bullying and threatening statements to employees; (2) made derogatory comments regarding County management" and County employees, (3) violated County policy when reassigning subordinates to different positions; (4) disregarded HSA objectives "regarding reunification of an infant with a relative in favor of her own personal interests," (5) disregarded agency protocols and procedures with respect to agency funds and gift cards, (6) requested prescription medications from employees, including Percocet, "Oxy," and Xanax, and (7) asked and expected employees to give her gifts in exchange for her approval of their leave requests, as well as to contribute to her children's fundraisers. (ECF No. 105-20 at 3-14; ECF No. 105-21 at 14-18.)

On June 29, 2023, Plaintiff applied for and received FMLA so she could obtain treatment for her mental health. (ECF No. 105-27; ECF No. 105-28.) Only the individual who processed the request, Ashley Berrington, was aware of it. (ECF No. 105-27.) That same date, Plaintiff began treatment with Mark Brehm, LCSW, who evaluated Plaintiff and diagnosed her with major depressive disorder, moderate, and PTSD. (ECF No. 108-2 at 13.)

On July 13, 2023, Plaintiff was given the investigative report and told that Brown was going to recommend to the county board that she be terminated. (ECF No. 105-25.) Instead of challenging the report's findings or proposed action, and before the board could act, Plaintiff resigned. (ECF No. 105-5 at 27-28; ECF No. 105-26).

Plaintiff's second amended complaint in this action asserts five claims for relief: (1) unlawful intentional discrimination in violation of 42 U.S.C. §§ 1981a and 1988, and discrimination in violation of the ADA, 42 U.S.C. § 11212, for (a) failing to engage in an interactive process, (b) failing to provide reasonable accommodation (leave of absence), (c) requiring Plaintiff to undergo a medical examination unrelated to her job and inconsistent with

business necessity, and (d) taking adverse action of constructive discharge (Counts One and Two); (2) retaliation in violation of the ADA, 42 U.S.C. § 12203 (Count Three); (3) discrimination in violation of the Rehabilitation Act, 29 U.S.C. § 12131, et seq. (Count Four); and (4) violation of Nevada Revised Statutes § 613.330 (Count Five).

Defendant moves for summary judgment on all of Plaintiff's claims. Plaintiff's cross-motion seeks a ruling in her favor on two discrete elements of her claims.

## III. STANDARD

The legal standard governing this motion is well settled: a party is entitled to summary judgment when "the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Cartrett*, 477 U.S. 317, 330 (1986) (citing Fed. R. Civ. P. 56(c)). An issue is "genuine" if the evidence would permit a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A fact is "material" if it could affect the outcome of the case. *Id*. at 248 (disputes over facts that might affect the outcome will preclude summary judgment, but factual disputes which are irrelevant or unnecessary are not considered). On the other hand, where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *Anderson*, 477 U.S. at 250.

"The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court." *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994) (citation omitted); *see also Celotex,* 477 U.S. at 323-24 (purpose of summary judgment is "to isolate and dispose of factually unsupported claims"); *Anderson,* 477 U.S. at 252 (purpose of summary judgment is to determine whether a case "is so one-sided that one party must prevail as a matter of law").

In considering a motion for summary judgment, all reasonable inferences are drawn in the light most favorable to the non-moving party. *In re Slatkin*, 525 F.3d 805, 810 (9th Cir. 2008) (citation omitted); *Kaiser Cement Corp. v. Fischbach & Moore Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986). That being said, "if the evidence of the nonmoving party "is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249-250 (citations omitted). The court's function is not to weigh the evidence and determine the truth or to make credibility determinations. *Celotex,* 477 U.S. at 249, 255; *Anderson*, 477 U.S. at 249.

In deciding a motion for summary judgment, the court applies a burden-shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, 'it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.'… In such a case, the moving party has the initial burden of establishing the absence of a genuine [dispute] of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rest., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal citations omitted).

In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party cannot establish an element essential to that party's case on which that party will have the burden of proof at trial. *See Celotex Corp. v. Cartrett*, 477 U.S. 317, 323-25 (1986).

If the moving party satisfies its initial burden, the burden shifts to the opposing party to establish that a genuine dispute exists as to a material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party need not establish a genuine dispute of material fact conclusively in its favor. It is sufficient that "the claimed factual dispute

be shown to require a jury or judge to resolve the parties' differing versions of truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (quotation marks and citation omitted).

The nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *Matsushita*, 475 U.S. at 587. Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine dispute of material fact for trial. *Celotex*, 477 U.S. at 324.

## IV. DISCUSSION

A. Disability Discrimination

"The ADA prohibits an employer from discriminating 'against a qualified individual with a disability because of the disability.'" *Nunes v. Wal–Mart Stores, Inc.*, 164 F.3d 1243, 1246 (9th Cir. 1999) (quoting 42 U.S.C. § 12112(a)).

The *McDonnell-Douglas* burden-shifting framework applies to claims of disability discrimination. *See Mattioda v. Nelson*, 98 F.4th 1164, 1178 (9th Cir. 2024) (Rehabilitation Act claim). Under that framework, a plaintiff must first establish a prima facie case of discrimination. Once she does so, the burden shifts to the employer to state a legitimate, non-discriminatory reason for the adverse employment action. If the employer does so, the burden then shifts back to the plaintiff to establish that the employer's stated reason was pretextual. *Id.*

The Ninth Circuit has held there is no significant difference in analysis of the rights and obligations created by the ADA and the Rehabilitation Act. *Id.* at 1173 (quoting *Zukle v. Regents of Univ. of California*, 166 F.3d 1041, 1045 n.11 (9th Cir. 1999)). Courts have also held that claims under Nev. Rev. Stat. § 613.330 follow the same standard as the ADA. *See Ulloa v.*

*Nevada Gold Mines*, 2024 WL 728696, at *6 n.8 (D. Nev. 2024) (collecting cases). Plaintiff's claims of discrimination under the ADA, the Rehabilitation Act, and Nev. Rev. Stat. § 613.330 in Counts One, Two, Four, and Five are thus all subject to the same following analysis.

1. <u>Prima Facie Case</u>

To prevail on a claim of disability discrimination, "the plaintiff must establish a prima facie case by showing that: (1) [s]he is a disabled person within the meaning of the statute; (2) [s]he is a qualified individual with a disability; and (3) [s]he suffered an adverse employment action because of [her] disability." *Hutton v. Elf Atochem N. Am., Inc.*, 273 F.3d 884, 891 (9th Cir. 2001); *see also Mattioda*, 98 F.4th at 1178.

Defendant argues that Plaintiff cannot establish either that she is disabled or that she was subjected to an adverse employment action because of her disability. (ECF No. 117 at 2-3.)

a. <u>Disability</u>

A disability is, in relevant part,[4] "a physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U.S.C. § 12102(1)(A). Impairments include "(2) any mental or psychological disorder," such as an "emotional or mental illness." 29 C.F.R. § 1630.2(h). "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A).

"An impairment is a disability . . . if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population." 29 C.F.R.

---

[4] A disability can also be a "(B) a record of such an impairment; or (C) being regarded as having such an impairment," 42 U.S.C. § 12102(1)(B),(C), but Plaintiff does not allege a disability under either of these definitions.

§ 1630.2(j)(1)(ii). The regulations set forth several rules of construction for the term "substantially limits," including that it must "be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA," that "[a]n impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting," and that "not every impairment will constitute a disability." *Id.* at § 1630.2(j)(1)(i),(ii); *see also Shields v. Credit One Bank, N.A.*, 32 F.4th 1218, 1223 (9th Cir. 2022).

The regulations also provide that "whether an impairment 'substantially limits' a major life activity should not demand extensive analysis" because the focus should be on "whether covered entities have complied with their obligations and whether discrimination has occurred, not whether an individual's impairment substantially limits a major life activity," and that the effects of an impairment need not be long-term or permanent to be considered substantially limiting. 29 C.F.R. § 1630.2(j)(1)(iii),(ix). Finally, an impairment can substantially limit a major life activity even if it does not "prevent, or significantly or severely restrict" the activity." *Nunies v. HIE Holdings, Inc.*, 908 F.3d 428, 436 (9th Cir. 2018) (citing 29 C.F.R. § 1630.2(j)(1)(ii) (concluding that "a stabbing pain when raising one's arm above chest height substantially limits the major life activity of lifting and possibly working" even though Plaintiff was able to work through the pain).

Plaintiff claims disability due to major depressive disorder, PTSD, and anxiety.[5] Defendant concedes that at least some of these conditions are impairments but argues that

[5] Defendant argues that Plaintiff improperly added anxiety and stress as new theories of liability at summary judgment when those things were not alleged in her complaint. Plaintiff has clarified that she is not claiming disability on the basis of stress. And although the complaint does not identify anxiety as one of Plaintiff's disabilities, it does allege disability based on Dr. Lemus' diagnosis of "adjustment disorder." The record clearly reflects that Dr. Lemus' diagnosis was

Plaintiff cannot show that she was substantially limited in a major life activity as compared to most people in the general population and so they were not, for Plaintiff, disabilities.

Plaintiff asserts that her impairments substantially limited her ability to (1) sleep, (2) concentrate, (3) communicate, and (4) think.[6]

On the question of communication, concentration and thinking, Plaintiff points to her colleagues' observations, stretching back several months, that she was having difficulty focusing, slurring her words, and engaging in erratic decision-making. She also cites a notation in her medical records that her thought process was irrational and "blocked." (ECF No. 108-2 at 8.) Finally, she points to several mentions in her medical records noting her difficulties sleeping. (ECF No. 108-2 at 5; ECF No. 105-14 at 3.)

Plaintiff's medical records are of little help in substantiating her assertion that she was limited in sleeping and thinking, as all of them are dated well *after* Defendant's initiation of the misconduct investigation and substance abuse evaluation. Those records most contemporaneous with Defendant's initiation of the investigation show no difficulties with Plaintiff's sleep or thinking. Most of the notations in Plaintiff's medical records regarding lack of sleep occurred two *months* after the investigation was started.[7] But at the time the investigation started – when Plaintiff checked into Reno Behavioral Health – Plaintiff reported getting 7-8 hours of

---

"Adjustment Disorder with *Mixed Anxiety* and Depressed Mood." (*See* ECF No. 108-3 (emphasis added).) Accordingly, the court concludes that Defendant was sufficiently on notice of the basis of Plaintiff's claim, and that Plaintiff did not improperly add a theory of disability at the summary judgment stage.

[6] Plaintiff's complaint also alleges limits on her ability to interact with others, but her summary judgment filings do not address this limitation in any way.

[7] Dr. Lemus's notes indicate for the first – and only time -- that Plaintiff was struggling with sleep on June 28, 2023. (ECF No. 108-3 at 3.) And Plaintiff did not begin treatment with Brehm, who also noted sleep problems, until June 29, 2023. (ECF No. 108-2 at 2.)

consecutive sleep per day. (ECF No. 108-1 at 22.) While Fung noted Plaintiff's self-report that she had been having sleep issues for five years, there is no indication of the severity of these issues, and nothing to tie them to any of her claimed impairments.

As to thinking, although Brehm noted in June 2023 that Plaintiff's thought process was irrational and blocked, on or around May 4, 2023 – when Defendant initiated the investigation – her thought process was described as "circumstantial and logical," and her judgment and insight were "fair." (ECF No. 108-1 at 27.)

In her deposition, Plaintiff explained that, starting in December 2022, her PTSD impacted her life by causing difficulty sleeping, nightmares a couple times a week, and frequent worries about her job.[8] (ECF No. 105-1 at 11-13.) Plaintiff's depression caused her to have difficulties listening and focusing at work and led her to occasionally feel isolated (about five times a year). (*Id.* at 16-18.)

Defendant argues that Plaintiff has offered no evidence to substantiate that she is at a comparative disadvantage to most people in the general population in regard to thinking, concentrating, sleeping, and interacting with others. Further, Plaintiff has offered no evidence to tie any of her alleged limitations to her impairments of PTSD, depression, and anxiety.

The court agrees that Plaintiff's evidence of an ADA-qualifying disability is minimal -- verging on nonexistent. Plaintiff makes no effort to establish that her limitations were caused by her impairments, and the evidence fails to explain the nature or severity of the limitations – either standing alone or as compared to most people in the general population – and particularly at the time when Plaintiff alleges Defendant began its string of adverse actions against her.

---

[8] While she also asserted she was having panic attacks about three times a month, she admitted those did not begin until November 2023, well after she resigned from her position at the County.

However, the court is also cognizant of the directive that "substantially limiting" must be broadly construed and the bar for establishing a prima facie case of discrimination is low, which makes the question in this case much more difficult to answer. Ultimately, the court concludes it need not do so, because it is clear that Plaintiff cannot at any rate establish her alleged disabilities were the "but-for" cause of her termination.

b. Causation

Plaintiff's claim of discrimination relies on the following adverse employment actions:[9] (1) terminating Plaintiff's access to her work cell phone; (2) investigating Plaintiff for misconduct; (3) placing Plaintiff on unpaid leave; and (4) recommending Plaintiff's termination. Plaintiff also argues she was constructively discharged. For the purpose of resolving this motion, the court assumes without deciding that all of these amounted to adverse employment actions and that Plaintiff can establish constructive discharge.

It is undisputed that Plaintiff was not diagnosed with PTSD until *after* Defendant ordered both the substance abuse evaluation and independent investigation. And it further undisputed that Plaintiff never told Defendant that she was being treated for PTSD. (ECF No. 105-1 at 14-15.) Plaintiff, thus, simply cannot show that Defendant subjected her to adverse employment actions on the basis of a condition of which it was not aware. She cannot establish causation.

Plaintiff's depression diagnosis came earlier -- according to her testimony, in 2018. In her deposition Plaintiff claimed Thomas had known of her diagnosis for many years. (ECF No. 105-1 at 15-16, 21-22.) But Plaintiff admitted that she was able to function on medication until January 2023, when her depression became "increasingly impactful." (*Id.* at 15-16.) In February

---

[9] Plaintiff also alleges the failure to accommodate, which the court discusses separately below.

2023, Plaintiff claims she told Thomas that she was struggling, panicking, upset and worried, and she needed help and support or something bad was going to happen. (*Id.* at 19, 21-25).

While Plaintiff's testimony could create an issue of fact as to whether Defendant knew Plaintiff was enduring some type of mental health challenges before it initiated the evaluation of and investigation into her, there is no evidence that Defendant knew or should have known that Plaintiff's mental health challenges – which had only recently appeared and were not clearly tied to her depression – amounted to a disability. A single meeting during which Plaintiff complained of work-related stressors would have been insufficient to suggest to a reasonable person that Plaintiff was disabled.

There was, of course, more than just this single meeting. Not long after, Plaintiff's subordinates began to complain about her behavior, and then she appeared under the influence during a work meeting. However, there is nothing to link *this* behavior to Plaintiff's complaints about stress and anxiety (and even less to tie either to Plaintiff's diagnosis of depression – the only impairment Defendant of which may have been aware). Nor was Plaintiff's unusual behavior, on its own, sufficient as a matter of law to put Defendant on notice that Plaintiff might have a disability. Plaintiff's contention that Defendant knew she had a disability is supported by nothing more than gossamer threads.

Plaintiff's assertion that Defendant must have been aware she was disabled because Fung's evaluation disclosed she was suffering from personal and professional stress is likewise unavailing.[10] Not only was Fung's evaluation definitively *not* a diagnosis, it also does not follow that a person suffering personal and professional stress is necessarily disabled.

---

[10] Fung's evaluation was not even received by Defendant until May 30, 2023, more than a month into its investigation of Plaintiff's conduct. Plaintiff's argument that because Fung was in contact

Finally, even if Defendant learned of Plaintiff's alleged disability between the time it initiated the investigation and the other alleged adverse employment actions, which is not at all clear, there is no dispute that an independent investigation revealed that Plaintiff violated numerous policies of her employer.[11]

As the record is clear that Plaintiff engaged in misconduct under County policy, and "[c]ourts have recognized a distinction between termination of employment because of misconduct and termination of employment because of a disability." *Collings v. Longview Fibre Co*., 63 F.3d 828, 832 (9th Cir. 1995) ("[E]mployers must be allowed to terminate their employees on account of misconduct, 'irrespective of whether the employee is handicapped.'"). Plaintiff has failed to point to any other evidence that would suggest her alleged disability was the but-for cause of the adverse employment actions against her. Therefore, the court finds Plaintiff has not established the causation element of her prima facie case, and summary judgment in favor of Defendant on Plaintiff's claims of disability discrimination is therefore appropriate.

2. Legitimate, Nondiscriminatory Reason

Even if Plaintiff could establish her prima facie case, Defendant has carried its burden of identifying legitimate nondiscriminatory reasons for the investigation and resulting employment actions taken against Plaintiff. Defendant terminated Plaintiff for multiple violations of County policy: making bullying, threatening and derogatory statements, violating policy when reassigning subordinates, disregarding agency objectives "regarding reunification of an infant

---

with Hurley while the evaluation was being conducted, Fung must have shared her impression of Plaintiff's condition well before the official report was handed in is unsupported speculation.

[11] Even if Plaintiff now tries to offer justifications for *some* of her behavior, she has not disputed all of the investigation's findings.

with a relative in favor of her own personal interests," disregarding agency protocols and procedures with respect to agency funds and gift cards, requesting prescription medications from employees, including Percocet, "Oxy," and Xanax, and asking and expecting employees to give her gifts in exchange for her approval of their leave requests, as well as to contribute their time and money to fundraisers. Many of these concerns violated either County policy or agency objectives. (ECF Nos. 117-1 at 7-8, 117-4, 117-7, 117-19.)

Plaintiff asserts that her misconduct was a result of her disability, relying on *Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1139–40 (9th Cir. 2001), which held that for "purposes of the ADA, with a few exceptions, conduct resulting from a disability is considered to be part of the disability, rather than a separate basis for termination." However, Plaintiff fails to address most of the specific misconduct findings and certainly does not demonstrate or even explain how they were the result of her alleged disability.

Because Defendant has established a legitimate, non-discriminatory reason for its actions, the burden would shift back to Plaintiff to establish that this stated reason was pretext. And this, the court concludes, Plaintiff also cannot do.

3. <u>Pretext</u>

Pretext can be proven "in two ways: (1) indirectly, by showing that the employer's proffered explanation is 'unworthy of credence' because it is internally inconsistent or otherwise not believable, or (2) directly, by showing that unlawful discrimination more likely motivated the employe." *Chuang v. Univ. of California Davis, Bd. of Trs*., 225 F.3d 1115, 1127 (9th Cir. 2000). "Under Ninth Circuit law, circumstantial evidence of pretext must be specific and substantial in order to survive summary judgment." *Brown v. City of Tucson*, 336 F.3d 1181, 1188 (9th Cir. 2003) (cleaned up).

Plaintiff does not offer any direct evidence of discrimination. Rather, she relies on circumstantial evidence to make her case. Plaintiff asserts it was clear she was suffering from some kind of mental health impairment, and therefore, Defendant's decisions to subject her to investigations, evaluations, and the other related adverse employment actions were pretext. She argues the close proximity between her demonstrated impairments and the decision to put her on leave and investigate, in connection with the lack of any discipline or concerns about her conduct before that time, also supports a finding of pretext.

First, Plaintiff argues that Defendant decided to investigate her just two days after Fung advised the county that she was experiencing personal and professional stress. The timeline Plaintiff relies on is not supported by the evidence. The investigation into Plaintiff's conduct commenced on April 26, 2023, and Fung's final report in which she made this finding was not provided to Defendant until more than a month *later*, on May 30, 2023. Fung did not even finish evaluating Plaintiff until May 12, 2023, after the misconduct investigation had begun, and while she told the County the evaluation was complete on that date, she did not discuss any of her findings with Defendant at that time.

Plaintiff also argues the accumulation of years' worth of complaints about Plaintiff's performance only after she began exhibiting signs of impairment is sufficient to support a finding of pretext. This circumstantial evidence is not specific and substantial, for many of the reasons already discussed. While Plaintiff was clearly having performance problems, she offers no evidence to support her assertion that Defendant knew or should have known that those problems were being caused by a disability.

The fact that Plaintiff had not been subjected to any discipline or complaints prior to this time is not particularly compelling where the complaints about Plaintiff's conduct did not come

from her superiors, who would have been in a position to discipline her, but from her subordinates, who would have naturally feared consequences from reporting their boss' misconduct (and who in fact testified this was their reason for not coming forward earlier).

Considering the record as a whole, Plaintiff has not presented specific and substantial evidence of pretext, even assuming she could otherwise establish she is disabled and that her disability was the but-for cause of her termination. For that reason, Defendant is entitled to summary judgment on Plaintiff's claims of disability discrimination.

C. Reasonable Accommodation

"Title I of the ADA insures full opportunities for people with disabilities in the workplace by requiring reasonable accommodation of employees' disabilities by their employers." *Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1133 (9th Cir. 2001). "Once an employer becomes aware of the need for accommodation, that employer has a mandatory obligation under the ADA to engage in an interactive process with the employee to identify and implement appropriate reasonable accommodations." *Id.* at 1137.

For the same reasons discussed above regarding causation, Plaintiff has not presented any evidence that Defendant knew or should have known that she required an accommodation or that she even requested any accommodation.

Plaintiff argues that she can prevail on this claim even if she did not specifically seek an accommodation because Defendant had an affirmative obligation to engage in the interactive process once it became aware of the need for an accommodation, relying again on *Humphrey*, 239 F.3d 1128. But this reliance is unavailing.

In *Humphrey*, the plaintiff's employer had been given direct notice of the plaintiff's disability. That is simply not the case here. Plaintiff cites no authority for the proposition that an

employer must engage in an interactive process because the employee's odd and concerning behavior could, possibly, be the result of an undisclosed disability.

Accordingly, summary judgment in Defendant's favor is also appropriate on the failure to accommodate claim.

D. Medical Examination

The ADA prohibits an employer from requiring an employee – disabled or not -- to undergo a medical examination for the purpose of determining "whether such employee is an individual with a disability or as to the nature and severity of the disability" unless the exam is "shown to be job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A); *see also Brownfield v. City of Yakima*, 612 F.3d 1140, 1145 (9th Cir. 2010); *Indergard v. Georgia-Pac. Corp*., 582 F.3d 1049, 1052-53 (9th Cir. 2009); *Fredenburg v. Contra Costa Cnty. Dep't of Health Servs*., 172 F.3d 1176, 1182 (9th Cir. 1999) ("[P]laintiffs need not prove that they are qualified individuals with a disability in order to bring claims challenging the scope of medical examinations under the ADA."); *Yin v. State of Cal*., 95 F.3d 864, 867 (9th Cir. 1996); *see also* 29 C.F.R. § 1630.14(c) (An employer is allowed to "make inquiries into the ability of an employee to perform job-related functions.").

A "medical examination" is a "procedure or test that seeks information about an individual's physical or mental impairments or health." *Indergard*, 582 F.3d at 1053. A seven-factor test is used to determine whether a test constitutes a medical exam:

(1) whether the test is administered by a health care professional;

(2) whether the test is interpreted by a health care professional;

(3) whether the test is designed to reveal an impairment or physical or mental health;

(4) whether the test is invasive;

> (5) whether the test measures an employee's performance of a task or measures his/her physiological responses to performing the task;
>
> (6) whether the test normally is given in a medical setting; and,
>
> (7) whether medical equipment is used.

*Id.* at 1053-1054.

"Employers need to be able to use reasonable means to ascertain the cause of troubling behavior without exposing themselves to ADA claims." *Cody v. CIGNA Healthcare of St. Louis, Inc*., 139 F.3d 595, 599 (8th Cir.1998) (quoted in *Brownfield*, 612 F.3d at 1145). When

> health problems have had a substantial and injurious impact on an employee's job performance, [an] employer can require the employee to undergo a physical examination designed to determine his or her ability to work, even if the examination might disclose whether the employee is disabled or the extent of any disability. If such an examination is governed by the provisions of § 12112(d)(4)(A), it is covered by the business necessity exception.

*Yin v. State of Cal*., 95 F.3d 864, 868–69 (9th Cir. 1996).

The "'business necessity' standard . . . is quite high, and is not to be confused with mere expediency." *Brownfield*, 612 F.3d at 1145 (quoting *Cripe*, 261 F.3d 877, 890 (9th Cir. 2001)). The standard can be met "if the employer is faced with significant evidence that could cause a reasonable person to inquire as to whether an employee is still capable of performing his job." *Id.* "An employee's behavior cannot be merely annoying or inefficient to justify an examination; rather, there must be genuine reason to doubt whether that employee can perform job-related functions." *Id. (*citing *Sullivan v. River Valley Sch. Dist*., 197 F.3d 804, 811 (6th Cir. 1999)). "The employer bears the burden of demonstrating business necessity." *Id.* at 1146.

Defendant argues that Plaintiff's evaluation was not a medical exam, but that even if it were, it falls within the business necessity exception. Plaintiff asserts the exam went beyond

fitness for duty – in fact did not concern Plaintiff's ability to do her job at all - and was intended to and did delve into Plaintiff's mental health conditions.

The court finds there are genuine issues of material fact that preclude summary judgment on Plaintiff's claim that Defendant required her to undergo a medical exam in violation of the ADA.

To begin, Defendant has not established as a matter of law that the substance abuse evaluation in this case was not a medical examination. Defendant cites no case law to support the proposition that a substance abuse evaluation is not a medical exam. And the evaluation here was intended to determine whether Plaintiff had a substance abuse disorder, which is a diagnosable mental health condition.[12] (ECF No. 105-13 at 19.) Application of the relevant factors does not clearly suggest otherwise, particularly where the evaluation was administered and interpreted by a health care professional and was designed to reveal (and in fact, did reveal) Plaintiff's physical and mental health. There is therefore an issue of fact as to whether the exam in this case amounted to a medical exam.

Defendants would nevertheless be entitled to summary judgment if the exam were "job-related" and consistent with "business necessity." For two reasons, however, the court cannot grant summary judgment on this basis, either.

First, the evaluation itself was not intended to assess whether Plaintiff was able to perform her job. Fung testified that she was not given a list of Plaintiff's job duties, nor was she hired to determine Plaintiff's fitness for duty. (ECF No. 105-13 at 20.)

---

[12] In fact, a substance use disorder may in some cases even be considered a disability itself. *See, e.g.*, *Tyson v. Oregon Anesthesiology Grp., P.C.*, No. CIV. 03-1192-HA, 2008 WL 2371420, at *8 (D. Or. June 6, 2008).

The evidence does suggest the evaluation was meant to be a tool for Defendant to use in making its own determination of whether Plaintiff was fit for duty. However, it is certainly possible that a person could suffer from a substance abuse disorder and still be able to do their job. This means that -- unless the evaluation were limited to ascertaining whether the employee had a substance abuse disorder that impacted their ability to work -- at least some of the information gathered in a substance abuse evaluation would not be "job-related" or consistent with business necessity.

For the first time in it reply, Defendant argues the evaluation was "narrowly tailored" to determine whether Plaintiff was suffering from a substance abuse disorder that could impact her ability to do her job. (ECF No. 131 at 16.) But beyond this belated assertion, it does not cite any evidence to support this claim.[13] Accordingly, there is a genuine issue of material fact as to whether the evaluation *in this case* was job-related and consistent with business necessity. [14]

Second, Plaintiff argues, and the court agrees, there are genuine issues of material fact as to whether Defendant had "significant evidence that could cause a reasonable person to inquire

---

[13] Defendant cites Thomas' declaration, in which she states "Hurley decided Ms. Howell should be evaluated by a substance abuse counselor to determine whether she had a drug or alcohol problem and was fit to perform her duties." (ECF No. 105-5 at 3.) Defendant also cites Hurley's declaration, in which she states the county hired Fung to assess whether Plaintiff "had an alcohol or substance abuse problem so I could assess whether she was fit to perform her duties." (ECF No. 105-12 at 2; *see also* ECF No. 117-8.) This evidence does not establish that the scope of the evaluation was narrowly tailored to whether Plaintiff had a substance abuse problem that impacted her ability to perform her job.

[14] Also for the first time in its reply, Defendant cites *Conrad v. Bd. of Johnson Cnty. Comm'rs*, 237 F. Supp. 2d 1204, 1234 (D. Kan. 2002) for the proposition that "[e]valuations inquiring into stress-related alcoholism are job-related and consistent with business necessity." While the district court in that case did indeed find that questions put to the plaintiff about potential alcohol abuse were job-related, it was an alternative finding. *Conrad* involved more extreme behavior on the plaintiff's part than that involved here. For those reasons, the court does not find *Conrad* particularly compelling as to the question of whether in this case the substance abuse evaluation was job-related and consistent with business necessity.

as to whether" Plaintiff was still capable of performing her job. Defendant had the video of the April 5, 2023, meeting – a single day -- during which Plaintiff exhibited some odd behavior, and Defendant had the prior complaint of Plaintiff's subordinate that Plaintiff had been behaving erratically, unable to stay focused, and slurring her speech. The question of whether this amounted to "significant evidence" is close enough that it is for the trier of fact, and not for this court on summary judgment, to determine.

Accordingly, Defendant's motion for summary judgment on this claim will be denied.

E. Retaliation

The court previously dismissed Plaintiff's retaliation claim, with prejudice, to the extent it sought compensatory or punitive damages. (*See* ECF No. 8 at 21 (citing *Alvarado v. Cajun Operating Co*., 588 F.3d 1261, 1270 (9th Cir. 2009).) It allowed the claim to proceed to the extent Plaintiff sought equitable relief. (*See id.*)

Notwithstanding the court's order, Plaintiff continues to seek compensatory damages – and as far as the court can tell *only* compensatory damages -- for Defendant's alleged retaliation. The retaliation claim in Plaintiff's second amended complaint refers to only compensatory damages, (ECF No. 40 at 17), and in response to Defendant's summary judgment motion, Plaintiff utterly fails to identify what equitable relief she might be seeking in connection with her claim – she does not even argue that she is seeking equitable relief. (ECF No. 129 at 30.) Rather, she continues to assert that she might be entitled to compensatory damages, which the court has already concluded she is not. On that basis alone, Defendant is entitled to summary judgment on Plaintiff's retaliation claim.

But Defendant is also entitled to summary judgment on the merits of Plaintiff's retaliation claim.

The ADA bars retaliation "against any individual because such individual has opposed any act or practice made unlawful by" the ADA. 42 U.S.C. § 12203(a). As with a discrimination claim, retaliation claims are also analyzed on summary judgment by applying the three-part *McDonnell-Douglas* burden shifting framework. *Kama v. Mayorkas*, 107 F.4th 1054, 1058-59 (9th Cir. 2024).

Plaintiff must therefore first establish a prima facie of case of retaliation by adequately alleging that: "(1) she engaged in an activity protected under Title VII; (2) her employer subjected her to adverse employment action; and (3) there was a causal link between the protected activity and the employer's action." *Id.* at 1059 (cleaned up). A plaintiff's evidentiary burden on the prima facie case is low. *Id.*

After a plaintiff establishes a prima facie case, the burden then shifts to the defendant to set forth "some legitimate, nondiscriminatory reason for the challenged action." *Id.* If the employer does that, burden shifts back to the plaintiff to show the stated reason was pretext. *Id.* "If there is abundant and uncontroverted independent evidence supporting the defendant's stated motive, then plaintiff's creation of only a weak issue of fact as to whether the employer's reason was untrue will not suffice." *Id.* (cleaned up).

Plaintiff asserts she was retaliated against for hiring an attorney on May 1, 2023, and asserts she was subjected to the following adverse employment actions: (1) the investigation; (2) her placement on leave without pay; and (3) the recommendation that she be terminated.

Even assuming that Plaintiff can surmount the low bar to establish her prima facie case, Defendant is entitled to summary judgment for much the same reasons discussed in connection with Plaintiff's claims of discrimination. Defendant has proffered legitimate, non-discriminatory reasons for the adverse actions against Plaintiff, and Plaintiff has failed to offer specific and

compelling evidence of pretext. While Plaintiff relies on the temporal proximity between her hiring of an attorney, her unpaid leave, and the recommendation she be terminated, this mere temporal proximity is insufficient in this case. This is because those two adverse employment actions were the direct result of the first adverse employment action, which undisputedly occurred before Plaintiff hired an attorney.

Accordingly, Defendant's motion for summary judgment on Plaintiff's claim of retaliation will be granted.

F. Plaintiff's Motion for Summary Judgment

Plaintiff's motion for summary judgment seeks a ruling from the court that she has established, as a matter of law, certain elements of her claims against Defendants: specifically, that she is disabled and that she is a qualified individual with a disability.

Because Defendant is entitled to summary judgment on all claims to which those elements relate, Plaintiff's motion for summary judgment is denied.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

## V. CONCLUSION

In accordance with the foregoing, **IT IS THEREFORE ORDERED** that:

(1) Defendant's motion for summary judgment (ECF No. 105) is GRANTED IN PART and DENIED IN PART. It is DENIED as to Plaintiff's claim that Defendant made her undergo a medical exam in violation of the ADA, and it is GRANTED in all other respects.

(2) Plaintiff's motion for partial summary judgment (ECF No. 107) is DENIED.

(3) The parties shall meet and confer and file a proposed joint pretrial order within thirty (30) days of the date of this order.

**IT IS SO ORDERED**.

Dated: August 5, 2026

Craig S. Denney
United States Magistrate Judge